STATE OF CONNECTICUT *v.* ANONYMOUS[*]

COTTER, C. J., LOISELLE, BOGDANSKI, LONGO and PETERS, Js.

---

[*] In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book, 1978, § 3161, the names of the parties involved in this appeal are not disclosed and the records and briefs will not be distributed to the various libraries of the state. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Supreme Court.

156

Argued June 13—decision released September 18, 1979

*James E. Bransfield,* with whom was *Sue Ann Shay,* for the appellant (defendant).

*Patricia Pac,* assistant attorney general, with whom were *Paul M. Shapiro,* assistant attorney general, and, on the brief, *Carl R. Ajello,* attorney general, for the appellee (plaintiff).

Loiselle, J. This is an appeal filed by the defendant mother (hereinafter the defendant) from a decision of the Superior Court granting simultaneous petitions of neglect and termination of parental rights filed pursuant to General Statutes § 17-43a (b) by the commissioner of children and youth services. The defendant has appealed from only the decision to terminate her parental rights. The following facts were found by the trial court. The child in question was born on January 5, 1977. The defendant was hospitalized for three weeks after the child was born. The baby was taken from the hospital after birth by her maternal grandmother. From the time of her discharge to the time the petitions for neglect and termination of parental rights were filed the defendant refused to take the child into her care. She repeatedly refused assistance which would have enabled her to care for her child. Her main reasons for refusing to take the child were ill health and insufficient space in her apartment. She consistently failed, however, to keep medical appointments, to take the prescribed medication regularly or to accept

psychiatric help to improve and stabilize her health. The defendant was never told that her medical condition would not permit her to take care of her child. Her apartment had adequate space.

By the time the child was five months old she had been in four different homes, had had four different caretakers and had been hospitalized once. Two of the placements had been with foster parents who were complete strangers to the defendant. The child was placed in the second foster home in June, 1977. Between that date and the termination hearing in August of 1978, the defendant visited the child no more than four times. On the basis of the above evidence, the court concluded that the child was "neglected by reason of abandonment." The defendant's parental rights were terminated because she failed to provide the care, guidance and control necessary for the child's physical, emotional, educational and moral well-being.

I

On appeal, the defendant does not contest the merits, but raises four constitutional claims. Her first claim of error is that she was denied the effective assistance of counsel. As a threshold matter, the plaintiff contends that the defendant is precluded from raising the issue of incompetency of counsel because she did not include it in her assignment of errors. This court is not "bound" to, and ordinarily will not, consider any claims of error unless they are assigned specifically and distinctly. Practice Book, 1978, § 3063; *Gould* v. *Rosenfeld,* 178 Conn. 503, 505, 423 A.2d 146 (1979) ; *American Brass Co.* v. *Ansonia Brass Workers' Union,* 140 Conn. 457, 463, 101 A.2d 291 (1953) ; *Putterman* v. *Miller,* 133 Conn. 70, 73, 48 A.2d 235 (1946) ; Maltbie,

Conn. App. Proc. § 167. This court may, however, consider claims not properly assigned and will sometimes examine them so as to see that no substantial injustice has been done. *State* v. *Hayes,* 127 Conn. 543, 595, 18 A.2d 895 (1941). The defendant, while neglecting to assign ineffective assistance of counsel as an error, did delineate it as an issue in her "Request for Finding." She briefed the issue. The plaintiff addressed the issue extensively in its brief. Once alerted, the defendant filed an amended assignment of errors. Practice Book, 1978, § 3035. Since the amendment was filed before oral argument and since the plaintiff thoroughly briefed the issue in question, we will address it.

The issue of ineffective assistance of counsel at a termination of parental rights hearing is one of first impression for this court. The right to effective assistance of counsel enunciated in *McMann* v. *Richardson,* 397 U.S. 759, 771, 90 S. Ct. 1441, 25 L. Ed. 2d 763 (1970), which the defendant urges us to adopt, is grounded in the sixth amendment to the United States constitution, which is expressly limited to a defendant in a criminal action.[1] Article first, § 8, of the Connecticut constitution similarly limits the right to counsel to criminal defendants.[2] Neither the sixth amendment to the United States constitution nor article first, § 8, of the Connecticut constitution can be extended to a parent in a termination of parental rights hearing to provide a right to effective assistance of counsel. *In re*

[1] The sixth amendment to the United States constitution states: "In all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defence."

[2] Article first, § 8, of the Connecticut constitution states: "In all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel . . . ."

*Luscier,* 84 Wash. 2d 135, 524 P.2d 906 (1974). Where, however, as here, a statute (General Statutes § 46b-136) or practice book rule (Practice Book, 1978, § 1045) mandates the assistance of counsel, it is implicit that this means competent counsel. Because of the substantial interests involved, a parent in a termination of parental rights hearing has the right not only to counsel but to the effective assistance of counsel. For this unique situation, we adopt the standard we enunciated in *Buckley* v.*Warden,* 177 Conn. 538, 543, 418 A.2d 913 (1979) : "The range of competence . . . requires not errorless counsel, and not counsel judged ineffective by hindsight, but 'counsel whose performance is reasonably competent, or within the range of competence displayed by lawyers with ordinary training and skill in [that particular area of the] law.' *State* v. *Barber,* 173 Conn. 153, 155, 376 A.2d 1108 (1977) ; *State* v. *McClain,* 171 Conn. 293, 301, 370 A.2d 928 (1976)." The defendant must, moreover, demonstrate that the lack of competency contributed to the termination of parental rights. *State* v. *Clark,* 170 Conn. 273, 365 A.2d 1167, cert. denied, 425 U.S. 962, 96 S. Ct. 1748, 48 L. Ed. 2d 208 (1976).

The defendant in her brief has composed a laundry list of acts of omission and commission committed by trial counsel. Practice Book, 1978, § 3020, which governs this appeal, requires a finding "[i]f the error claimed is in rulings upon the admission or rejection of evidence or other rulings in the course of the trial . . . ." See *Lomas & Nettleton Co.* v. *Cadoux,* 163 Conn. 603, 604, 316 A.2d 413 (1972) ; *Socony Mobil Oil Co.* v. *Zoning Board of Appeals,* 153 Conn. 257, 261, 216 A.2d 201 (1965). We cannot review the defendant's claims as to her trial counsel's failure to object to the admission of

the medical report, his failure to challenge the qualifications of the state's chief witness, his failure to object to certain testimony and his failure to call certain critical witnesses since there are no factual findings upon which we can make a determination. *State* v. *Anderson,* 178 Conn. 287, 290–91, 422 A.2d 323 (1979).

The defendant claims that, since the petition did nothing more than track the language of the statute, trial counsel should have filed a motion to dismiss or a motion to review. This allegation is reviewable without a finding because it appears on the face of the record. Practice Book, 1978, § 3020; *City Savings Bank* v. *Lawler,* 163 Conn. 149, 152, 302 A.2d 252 (1972). Practice Book, 1978, § 1049, states that the petition for termination of parental rights shall allege the particular section of the statute upon which the action is predicated and "shall set forth with reasonable particularity the facts, circumstances, or conditions in support of the application. . . ." The record indicates that the petition for termination contained the particular section of the statute, but there were no references to particular acts or omissions on the part of the defendant. The addendum to the neglect petition, however, which was filed and served on the same day as the termination proceedings, contained sufficient factual background to give the defendant notice of the acts or omissions complained of. Moreover, the record indicates that the defendant was sufficiently apprised to prepare her defense. Trial counsel's failure to make merely pro forma motions to correct or dismiss without a showing of resulting prejudice to the defendant does not amount to ineffective assistance of counsel.

## II

The defendant attacks the portion of General Statutes § 45-61f[3] under which her parental rights were terminated as unconstitutional on due process grounds. Her attack is hydra-headed. She contends that § 45-61f (2) violates her due process rights because (1) it is vague; (2) it impermissibly delegates unfettered discretion to state officials; (3) it contains no standard of proof; and (4) it is biased against indigent persons.

"The extent to which procedural due process must be afforded . . . is influenced by the extent to which [an individual] may be 'condemned to suffer grievous loss.' " *Goldberg* v. *Kelly*, 397 U.S. 254, 262, 90 S. Ct. 1011, 1017, 25 L. Ed. 2d 287 (1970). Thus, the initial inquiry must focus upon the interest which the defendant seeks to protect—the integrity of her family.

The right to the integrity of the family is among the most fundamental rights guaranteed by the fourteenth amendment.[4] In *Prince* v. *Massachusetts*, 321

---

[3] General Statutes § 45-61f states in pertinent part: "[T]he court, upon finding . . . (2) that the child has been denied, by reason of acts of parental commission or omission, the care, guidance or control necessary for his physical, educational, moral or emotional well-being whether such denial is the result of the physical or mental incapability of the parent or conditions attributable to parental habits, misconduct or neglect, and these parental acts or deficiencies are such as to support the conclusion that the parent cannot exercise, or should not, in the best interest of the child, be permitted to exercise, parental rights and duties . . . may approve the petition terminating the parental rights . . . ."

[4] The due process provision of the Connecticut constitution has the same meaning and imposes similar constitutional limitations as that of the federal constitution. *McKinney* v. *Coventry*, 176 Conn. 613, 616, 410 A.2d 453 (1979).

U.S. 158, 166, 64 S. Ct. 438, 88 L. Ed. 645 (1944), the United States Supreme Court stated: "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder. . . . And it is in recognition of this that [our previous decisions] have respected the private realm of family life which the state cannot enter." More recently, the court held in *Stanley* v. *Illinois,* 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972), that a conclusive presumption that unwed fathers are unfit to have custody of their children violated the fourteenth amendment. In defining the right at stake, the court held that "[t]he rights to conceive and to raise one's children have been deemed 'essential,' . . . 'basic civil rights of man' . . . ." *Id.,* 651.

The defendant argues that § 45-61f (2) is unconstitutionally vague because: it does not inform an ordinary person what conduct is required, or must be avoided, in order to prevent the termination of parental rights; it inhibits parents in their fundamental right to family integrity; and it gives unfettered discretion to social workers and courts.

While vagueness attacks are made most often in the criminal context, the United States Supreme Court has held that civil statutes are susceptible to vagueness challenges as well. *A. B. Small Co.* v. *American Sugar Refining Co.,* 267 U.S. 233, 45 S. Ct. 295, 69 L. Ed. 589 (1925). This court has recently answered a void for vagueness attack against a state tax statute. *McKinney* v. *Coventry,* 176 Conn. 613, 619, 410 A.2d 453 (1979). A vagueness attack stems from "the exaction of obedience to a rule

or standard which [is] so vague and indefinite as really to be no rule or standard at all." *A.B. Small Co.* v. *American Sugar Refining Co.,* supra, 239.

The initial danger in a vague statute is the absence of fair warning. Parents should be able to determine what course of conduct to follow by reference to the wording of a statute. The standard thus embodied must be specific and direct enough so that an ordinary person will know what conduct is required or must be avoided in order to prevent termination of parental rights. To withstand a vagueness challenge, a statute must state its standard with adequate clarity and mark sufficiently distinct boundaries for the law to be fairly administered. Lack of precision, however, is not, in or of itself, offensive to the requirement of due process. *Roth* v. *United States,* 354 U.S. 476, 77 S. Ct. 1304, 1 L. Ed. 2d 1498 (1957). Our review of § 45-61f (2) shows that its requirements are sufficiently clear and explicit: The evil that has to be avoided is any conduct on the part of the parent that would deny the child in question the care, guidance or control that would foster his well-being. "Well-being" according to the statute has physical, emotional, educational and moral components. The conduct that is proscribed, while not enumerated specifically, is delineated as that resulting from "physical or mental incapability" or "conditions attributable to parental habits, misconduct or neglect." It is true that these somewhat general phrases encompass a wide variety of conduct, but the process of parenting itself is multifaceted and encompasses all of life's activities. In view of the diversity of human nature, backgrounds and capabilities, and the differing aspirations of families in our society, it would be impossible to delineate specific conduct as acceptable or

unacceptable. What might be totally unacceptable parental behavior in one situation (the deprivation of certain material goods) might be an unfortunate but unavoidable fact of life in a different family situation.

More importantly, the Connecticut statute ties all of the requirements to "the best interest of the child" standard. While that standard itself does not have a precise meaning, it does not lack metes and bounds. Our case law has defined and circumscribed that standard over the years in custody disputes between parents and between parent and nonparent as well as in child neglect cases. See *In re Juvenile Appeal (Anonymous)* v. *Commissioner of Children & Youth Services,* 177 Conn. 648, 661–62, 420 A.2d 875 (1979); *Doe* v. *Doe,* 163 Conn. 340, 343, 307 A.2d 166 (1972); *Goshkarian's Appeal,* 110 Conn. 463, 468, 148 A. 379 (1930); *Kelsey* v. *Green,* 69 Conn. 291, 298, 37 A. 679 (1897). "Standards of mathematical precision are neither possible nor desirable in this field; much must be left to the trial judge's experience and judgment." *Petition of the New England Home for Little Wanderers,* 367 Mass. 631, 646, 328 N.E.2d 854 (1975). In light of the individualistic nature of each case, § 45-61f (2) is, on its face, precise enough to warn parents what is and what is not acceptable conduct.

The defendant further contends that General Statutes § 45-61f is unconstitutionally vague in that it impermissibly delegates unfettered discretion to state officials. Her specific objection is that under General Statutes § 45-61f a social worker, who has no medical background on which to base an opinion as to a child's physical welfare, may petition the

court to terminate an individual's parental rights. The short answer is that under the complete statutory scheme involved; General Statutes § 45-61 et seq.; there is no impermissible grant of discretion to state officials. General Statutes § 45-61c delineates the individuals who may petition the court. Under § 45-61f, in a contested case such as the present, the court "shall . . . request the commissioner of human resources or any child-placing agency . . . to make an investigation and written report to it . . . which report shall indicate the physical, mental and emotional status of the child and shall contain such facts as may be relevant to determine whether the proposed termination of parental rights will be for the welfare of the child, including the physical, mental, social and financial condition of the natural parents, and any other factors which the commissioner or such agency finds relevant to determine whether the proposed termination will be for the welfare of the child. . . ." This report is admissible in evidence and the individual making it may be required to attend the hearing and subject himself to examination. General Statutes § 45-61f. The report aside, the court is still required to make a finding that one of the statutory grounds for termination has been met. General Statutes § 45-61f. The statute and hearing provide sufficient safeguards to prevent arbitrary and capricious action[5] on the part of any social worker filing a petition. In the present case, the case worker who brought the petition was present at the hearing and her testimony was subject to cross-examination. Furthermore, the final decision

---

[5] Practice Book, 1978, § 1042 (2) requires that: "The petitioner shall be prepared to substantiate the allegations of the complaint both through the testimony of the petitioner's own workers and through that of the agencies and other individuals the petitioner has relied upon in determining that neglect exists."

on termination rests with the trial judge who must base his or her decision on a finding of one or more of the statutory grounds in § 45-61f or § 17-43a. As this court recently stated in *In re Juvenile Appeal (Anonymous)*, supra, 671–72, "in termination proceedings the statutory criteria must be met before termination can be accomplished." Judicial adherence to these statutory standards reduces the danger of arbitrary and biased decisions. Further, the trial court's finding of neglect must be based on a "fair preponderance of the evidence." [6]

The defendant finally argues that the vagueness of § 45-61f and its delegation of unfettered discretion coupled with the use of the best interests of the child standard leads to a class bias against indigent persons. In *In re Juvenile Appeal (Anonymous)*, supra, 672–73, this court noted the vulnerability of termination actions to bias: "Petitions for termination of parental rights are particularly vulnerable to the risk that judges or social workers will be tempted, consciously or unconsciously, to compare unfavorably the material advantages of the child's natural parents with those of prospective adoptive parents and therefore to reach a result based on such comparisons rather than on the statutory criteria. The United States Supreme Court has forcefully recognized this danger: 'Commentators have ... noted ... that middle- and upper-income families who need temporary care services for their children have the resources to purchase private care. . . . The poor have little choice but to submit to state-

---

[6] Practice Book, 1978, § 1049 on termination of parental rights states that all hearings on such application will be in accordance with §§ 1039 through 1049. Section 1043 delineates the standard of proof. "The allegations of a neglect petition shall be proved, as in a regular civil proceeding, by a fair preponderance of the evidence."

supervised child care when family crises strike. . . . Studies also suggest that social workers of middle-class backgrounds, perhaps unconsciously, incline to favor continued placement in foster care with a generally higher-status family rather than return the child to his natural family, thus reflecting a bias that treats the natural parents' poverty and lifestyle as prejudicial to the best interests of the child. [Citations omitted.] This accounts, it has been said, for the hostility of agencies to the efforts of natural parents to obtain the return of their children.' *Smith* v. *Organization of Foster Families for Equality & Reform,* 431 U.S. 816, 834–35, 97 S. Ct. 2094, 53 L. Ed. 2d 14 (1977)." The defendant, however, has presented this court with nothing but suppositions and allegations to support this claim. She would have us believe that her rights were terminated solely because she was poor. The defendant's parental rights were terminated on the basis of her actions and omissions, not her economic situation. The evidence adduced at trial shows that the child was not taken from the defendant, but was placed in foster care at the defendant's request. It is also noteworthy that there was no testimony given on the child's foster parents' life style as compared to the defendant's. On the basis of the above analysis, we conclude that the portion of General Statutes § 45-61f invoked against the defendant in this action is not unconstitutionally vague.

## III

The defendant's third assignment of error is that the simultaneous hearing of the petition to terminate her parental rights and the neglect petition violates due process of law. On May 12, 1978, the petitioner

filed a neglect petition pursuant to General Statutes § 17-62 (now § 46b-129) accompanied by a termination of parental rights petition pursuant to General Statutes § 45-61f. This simultaneous filing of petitions is specifically authorized by General Statutes § 17-43a (b).[7] It is the defendant's contention that the simultaneous hearings inhibited her in preparing her defense.[8]

The heart of the defendant's argument is that there is no compelling reason for simultaneous hearings. General Statutes § 17-43a (b) is a relatively new provision; it was not enacted until 1974. There is little legislative history on this specific provision (Public Acts 1974, No. 74-164), probably because it was a part of an omnibus bill which included proceedings relating to the adoption process. An analysis of § 17-43a (b) in context, however, illuminates its purpose. After enumerating the specific situations in which parental rights may be terminated (§ 17-43a [a]), § 17-43a (b) goes on to permit a simultaneous hearing in only one specifically deline-

---

[7] General Statutes § 17-43a (b) provides: "Any petition brought by the commissioner of children and youth services to the superior court, pursuant to subsection (a) of section 46b-129, may be accompanied by a petition for termination of parental rights with respect to such child as provided in section 45-61f provided notice shall be given in accordance with sections 45-61d and 45-61f. The superior court, upon notice and hearing, in accordance with the provisions of section 46b-129, may, in addition to granting the petition filed pursuant to section 46b-129, grant the petition for termination of parental rights as provided in section 45-61f."

[8] She alleges that the simultaneous hearing hindered her defense in that: "1. Evidence introduced as to one petition is considered as to both petitions . . . . 2. The flexibility of the Defendant is severely limited as to pleadings, stipulations and admissions. 3. There is the possibility that the trial court upon finding evidence sufficient for a removal of guardian will feel compelled, even to the point of abuse of discretion, to also terminate parental rights."

ated situation[9]—where the petition to terminate has been brought under § 46b-129 (a).[10] General Statutes § 46b-129 (a) provides that certain specified people can bring a petition establishing that a child is "neglected, uncared-for or dependent." When these two sections are read together it becomes apparent that the purpose of the simultaneous hearing procedure is to cover situations where there is a serious, imminent threat to a child's health, safety or well-being. It is important to note in this relation that the ultimate standard underlying the whole statutory scheme regulating child welfare is the "best interest

---

[9] The usual practice is to hold two trials on the separate issues of neglect and termination. In the neglect hearing, the court determines whether the child is neglected and makes an appropriate disposition. If attempts to rehabilitate the family fail, then a termination proceeding is pursued.

[10] "[General Statutes] Sec. 46b-129. (Formerly Sec. 51-310). COMMITMENT OF CHILD OR YOUTH. PETITION FOR NEGLECTED, UNCARED-FOR, DEPENDENT CHILD OR YOUTH. (a) Any selectman, town manager, or town, city, or borough welfare department, any probation officer, the Connecticut Humane Society, or the commissioner of human resources, the commissioner of children and youth services or any child-caring institution or agency approved by the commissioner of children and youth services, a child or his representative or attorney or a foster parent of a child, having information that a child or youth is neglected, uncared-for or dependent, may file with the superior court which has venue over such matter a verified petition plainly stating such facts as bring the child or youth within the jurisdiction of the court as neglected, uncared-for, or dependent, within the meaning of section 46b-120, the name, date of birth, sex, and residence of the child or youth, the name and residence of his parents or guardian, and praying for appropriate action by the court in conformity with the provisions of this chapter. Upon the filing of such a petition, the court shall cause a summons to be issued requiring the parent or parents or the guardian of the child or youth to appear in court at the time and place named, which summons shall be served not less than fourteen days before the date of the hearing in the manner presented by section 51-309, and said court shall further give notice to the petitioner and to the commissioner of children and youth services of the time and place when the petition is to be heard not less than fourteen days next preceding the hearing in question."

of the child." The public policy of this state as enunciated in General Statutes § 17-38a (a) is "[t]o protect children whose health and welfare may be adversely affected through injury and neglect . . . to provide a temporary or permanent nurturing and safe environment for children when necessary . . . ." Time is of the essence in child custody cases. See *In re Juvenile Appeal (Anonymous)* v. *Commissioner of Children & Youth Services,* 177 Conn. 648, 420 A.2d 875 (1979). Taken in context then, § 17-43a (b) provides a procedure for quickly freeing a "neglected" child for adoption. This furthers the express public policy of this state to provide all of its children a safe, stable nurturing environment.

It is also important to note that none of a parent's procedural safeguards is short-circuited by this process. There is an express statutory obligation to provide notice, there are two separate and distinct hearings, the defendant has a right to counsel, and the court must first find that the child is neglected before it can go on to determine if the parent's rights should be terminated in the best interest of the child.

The facts in the present case bear out the wisdom of this plan. Despite encouragement and offers of assistance made by the social agencies involved, the defendant made no effort to be reunited with the child from the time she left her with the first foster family in June, 1977, until the filing of the petitions in question here on May 12, 1978. At the time of the joint hearing (August, 1978), the child was nineteen months old—old enough to be actively aware of her environment. She had been with her second foster family for fourteen months. Further uncertainty and disruption would only have a negative

effect on her well-being. On its face and as applied, we do not find that § 17-43a (b) violated the defendant's due process rights.

## IV

The defendant finally urges that the failure to separate the adjudicatory and dispositional phases of the neglect hearing and the termination hearing violated her constitutional and statutory due process guarantees. She contends that General Statutes § 46b-129 and Practice Book, 1978, §§ 1041, 1042 and 1044 mandate separate and distinct proceedings for the adjudicatory and dispositional phases of neglect hearings. The defendant also argues that § 45-61f, which outlines the procedure for terminating parental rights, should, by analogy, be interpreted to require the same kind of bifurcated hearing. She further contends that she was deprived of her constitutional procedural protections because she was forced to defend herself simultaneously on four distinct matters combined in one trial. This latter assignment of error is really a rephrasing of the defendant's argument that her right to due process forbids the combining of the neglect and termination hearings. What we said on that issue in section III is dispositive of this claim.

A thorough reading of § 46b-129 reveals no mandate for a bifurcated hearing. It is significant that the defendant in her brief does not refer to any specific statutory language. Practice Book, 1978, § 1044 states: "(1) Upon adjudication of neglect, the court may admit into evidence any testimony relevant and material to the issue of the disposition, but no disposition may be made by the court until the mandatory study made by the commissioner of social services pursuant to General Statutes

§ 51-310 (c) [now § 46b-129 (c)[11]], has been submitted to the court." In addition, nothing in Practice Book, 1978, § 1044 reveals any intent to mandate two separate hearings. Compliance with the rules of practice occurs when the required social study is read by the court and counsel subsequent to adjudication and counsel has had an opportunity to cross-examine the writer of the report as to its contents. If the report is not ready or has not been made available to counsel, then there must be a hiatus. After the report has been produced, the parent may submit a plan to the court as to what the proper disposition should be. Practice Book, 1978, § 1044 (7). There is nothing in the statutory language of § 46b-129 or Practice Book, 1978, § 1044 that dictates a separation of the adjudicatory and dispositional phases. Separation is necessary only when: (1) the statutory report is not available; (2) the parents are not represented by counsel (Practice Book, 1978, § 1041) unless waived; or (3) the parents have not had time to formulate their dispositive plan. Practice Book, 1978, § 1044 (7).

The termination hearing (Practice Book, 1978, § 1049) is to be held in accordance with the provisions governing neglect hearings. Practice Book, 1978, §§ 1039 through 1043. The one difference is

[11] General Statutes § 46b-129 (c) states: "When a petition is filed in said court for the commitment of a child or youth, the commissioner of children and youth services shall make a thorough investigation of the case and shall cause to be made a thorough physical and mental examination of the child or youth if requested by the court. The court after hearing on the petition and upon a finding that the physical or mental ability of a parent or guardian to care for the child or youth before the court is at issue may order a thorough physical or mental examination, or both, of the parent or guardian whose competency is in question. The expenses incurred in making such physical and mental examinations shall be paid as costs of commitment are paid."

that the statutorily required report (General Statutes § 46b-129 [c]) has to be submitted to the court *prior* to trial. This allows a parent the opportunity to read all the material pertaining to the proposed termination prior to trial. Armed with such extensive information, the parent is in a formidable position to defend or explain any allegations. The availability of the report prior to trial precludes any necessity for a bifurcated hearing. In this context, however, it is significant that the trial court has to make a determination that the plaintiff has proved its case by a fair preponderance of the evidence before it goes on to decide whether termination of parental rights is in the child's best interest. Once the child is adjudicated neglected and the court has found that the grounds for termination have been proven, it then determines how the best interests of the child can be met. Nothing in the statutory language or the rules of practice forces the trial court into a preconceived decision. The spectrum of judgment ranges from return of the child to the biological home to termination of parental rights.

There is no error.

In this opinion the other judges concurred.