[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
On May 5, 1998, the plaintiffs, Connecticut Associated Builders and Contractors ("ABC"), All Electric Co., Electric Contractors, Inc. and John Schleifer, filed a three count complaint against the defendant. Theodore R. Anson, the commissioner of public works, seeking injunctive relief, attorney fees and costs.
In their amended complaint of May 20, 1998, the plaintiffs allege the following facts. On or about March 1, 1998, the defendant invited "sealed bids on a project described as Central Connecticut State University New Office/Classroom Building and Garage . . . .'" (¶ 6) The bid package contained a requirement that each bidder sign a Project Labor Agreement ("PLA")[1] to be entered into by the "Construction Manager for the Project, and the Connecticut State Building and Construction Trades Council ["BCTC"] . . . and each of its affiliated Local Unions . . ." (¶ 8) The plaintiff contractors, All Electric Co., Electric Contractors, Inc., and members of the plaintiff ABC allege that they would have submitted bids if they were not required to enter into the PLA. (¶ 10)
The plaintiffs claim in count one that by requiring all bidders to sign the PLA the commissioner acted in excess of the authority granted him by the competitive bidding statutes, General Statutes § 4b-91 et seq. In count two, they claim that certain parts of the competitive bidding statutes are unconstitutionally value and unlawfully delegate authority, and in count three that the commissioner's actions constitute unlawful infringement of the constitutional rights to free speech and association. The plaintiffs seek to enjoin the defendant from opening any bids submitted on the project or awarding any contracts, and from requiring that bidders and prospective bidders agree to the terms of the PLA.
The defendant moves to dismiss the entire complaint on the ground of sovereign immunity, arguing that an injunction would interfere with the performance of important government functions.
"We have . . . recognized that because the state can act only through its officers and agents, a suit against a state officer concerning a matter in which the officer represents the state is, in effect against the state. (Internal quotation marks omitted.) CT Page 9582Antinerella v. Rioux, 229 Conn. 479, 487, 642 A.2d 699
(1994).
"Sovereign immunity rests on the principle and on the hazard that the subjection of the state and federal governments to private litigation might constitute a serious interference with the performance of their functions and with their control over their respective instrumentalities, funds and property . . . In a constitutional democracy sovereign immunity must relax its bar when suits against the government complain of unconstitutional acts . . . When a state official's acts are in excess of legal authority or constitute an erroneous exercise of that authority, the interest in the protection of the plaintiff's right to be free from the consequences of such action outweighs the interest served by the sovereign immunity doctrine . . . Therefore, the state is subject to suit without consent[2] . . . in a suit for injunctive relief when the action does not defeat the purpose of the doctrine of sovereign immunity by undue interference with governmental functions." (Citations omitted; internal quotation marks omitted.) Pamela B. v. Ment, 244 Conn. 296, 328
(1998). "Where[, however,] no substantial claim is made that the defendant officer is acting pursuant to an unconstitutional enactment or in excess of his statutory authority, the purpose of the sovereign immunity doctrine requires dismissal of the suit for want of jurisdiction." (Internal quotation marks omitted.) Antinerella v.Rioux, supra, 229 Conn. 488.
"[T]he doctrine of sovereign immunity implicates subject matter jurisdiction and is therefore a basis for granting a motion to dismiss." (Internal quotation marks omitted.)Federal Deposit Ins. Corp. v. Peabody, N.E., Inc.,239 Conn. 93, 99, 680 A.2d 1321 (1996). "In ruling upon whether a complaint survives a motion to dismiss, a court must take the facts to be those alleged in the complaint, including those facts necessarily implied from the allegations, construing them in a manner most favorable to the pleader . . . [If] the plaintiffs' prayer for relief seeks . . . general equitable relief, the plaintiffs are entitled to invoke the long arm of equity to receive whatever relief the court may from the nature of the case deem proper. Any relief can be granted under the general prayer which is consistent with the case stated in the complaint and is supported by the proof provided the defendant will not be CT Page 9583 surprised or prejudiced thereby . . . In sum, at least when there is a prayer for general equitable relief, it is the law in our courts, as it is in the federal courts, that [a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." (Citations omitted; internal quotation marks omitted). Pamela B. v. Ment, supra,244 Conn. 308-09.
The plaintiffs allege that by limiting the bidding on this project to contractors willing to enter into the PLA, the commissioner acted in excess of the authority granted him under the statutes to set the conditions of a competitive bid. The commissioner argues that count one does not sufficiently allege actions in excess of statutory authority because it presents no facts as to how the conduct violates the competitive bidding statutes or undermines the objectives of the process.[3]
In count one, the plaintiff alleges that "[t]he PLA imposes conditions which violate the stated purposes of the competitive bidding statutes" (¶ 13) and are "not related to a bidder's status as the lowest responsible and qualified general bidder,'" which is a requirement of § 4b-91 for the award of a competitive bid. (¶ 11, 12) It further alleges that this decision was arbitrary and capricious in that the PLA that appeared in the bid invitation was drafted and finalized by the BCTC in February 1998 (¶ 14(e)): the commissioner established a committee in February 1998 to draft findings justifying the use of the PLA (¶ 14(f)). a decision that had been made in the fall of 1997 (¶ 14(a)), and the findings were based on a Model Resolution provided by the Connecticut Construction Labor Management Council (¶ 14(g)); the DPW did not consider any testimony or data considering the effect the PLA might have on cost, timeliness or efficiency of construction projects, competition, non union workers, safety, and public policy objectives relating to employment opportunities for minorities, women and the economically disadvantaged (¶ 14(j)-(o)) and that the DPW had no reason to believe that the Project would be subject to delays because of strikes or labor unrest, or that the PLA would ensure a more timely completion, or that the imposition of the PLA relates in any way to the provisions or purposes of the competitive bidding statutes (¶ 14(1)-(p)).[4]
The competitive bidding statutes[5] require the commissioner to hold competitive bids for most state building CT Page 9584 projects, and requires that the contract be awarded to the "lowest responsible and qualified bidder." General Statutes §4b-92.[6] "It is a well established principle that municipal competitive bidding laws are enacted to guard against such evils as favoritism, fraud or corruption in the award of contracts, to secure the best product at the lowest price, and to benefit the taxpayers, not the bidders: they should be construed to accomplish these purposes fairly and reasonably with sole reference to the public interest." (Internal quotation marks omitted.) Spiniello Construction Co. v. Manchester,189 Conn. 539, 543-44, 456 A.2d 1199 (1983). "[A]n objectionable and invalidating element is introduced when specifications are drawn to the advantage of one [party] not for any reason in the public interest but, rather, to insure the award of the contract to that particular [party]." (Internal quotation marks omitted.)Unisys Corp. v. Dept. of Labor, 220 Conn. 689, 696,600 A.2d 1019 (1991).
The commissioner argues that the bid package developed for this project does not violate the statutes, because there is nothing in the PLA itself that favors one prospective bidder over another. He argues further that it doesn't violate the requirement that the contract be awarded to "the lowest responsible and qualified bidder" because that standard is not applicable until after the bids are opened, not when developing the bid package. This argument does not address the allegations, which are directed, not at the PLA itself but on the requirement that each bidder agree to its use. In order to even be a "qualified bidder." a contractor has to agree to contract with the unions. The requirement of the PLA precludes a class of contractors from submitting bids, and, under these allegations. amounts to favoritism for those contractors who do not object to accepting a union workforce.
In Unisys Corp. v. Dept. of Labor, supra,220 Conn. 689, the plaintiff claimed that the Department of Labor acted illegally by sending out RFPs for computer equipment limited to those manufactured by IBM thus excluding it from submitting a bid to supply the department with its own computers, which were allegedly comparable to those from IBM. The court held that this amounted to favoritism because it selected one potential bidder over another. In that case, the Department of Labor also raised a defense of sovereign immunity, but with little discussion the court held that the claim had no merit because the alleged acts of favoritism in the competitive bidding process were in excess CT Page 9585 of statutory authority. Id., 697-98.
The commissioner also argues that he has broad discretion under the statutes to set the terms of a public bid, including establishing labor requirements, and that discretion encompasses the decision to use a PLA. The Supreme Court, in Antinerellav. Rioux, supra 229 Conn. 491, held that any grant of discretion is limited, and that "[n]ot all uses of that authority are protected." In Antinerella, the plaintiff, a deputy sheriff, alleged that the sheriff used his discretionary powers to hire and fire deputy sheriffs to advance an illegal fee splitting arrangement. The court allowed the claim to go forward. "[T]he doctrine [of sovereign immunity] does not apply when there is a substantial allegation of wrongful conduct to promote an illegal purpose in excess of the of officer's statutory authority." Id., 497.
Taking the allegations as true and construing them broadly, the court can presume that the commissioner decided to use the PLA without prior objective investigation into its need for this project to protect the public welfare and then worked with union representatives to determine the terms of the PLA and justify its use. These facts support an inference of favoritism towards union contractors and a conclusion that the decision was contrary to the public policy embedded in the competitive bidding statutes. This is a substantial allegation of wrongful conduct in excess of statutory authority. Therefore, count one is not barred by sovereign immunity.
In count two, the plaintiffs allege that the competitive bidding statutes are unconstitutionally vague and an unauthorized delegation of legislative power, thus rendering the commissioner's actions null and void. The commissioner argues that the discretion granted is reasonable and necessary in light of the complexity of building projects.
Specifically the plaintiffs allege that the statutes "fail to: (1) declare a legislative policy concerning the use of project labor agreements, (2) establish primary standards to carry out any such policy, or (3) lay down an intelligible principle to which an administrative body must conform." (¶ 17) Furthermore, they allege that there is no authority for the decision to use the PLA in the competitive bidding statutes (¶ 19) because the statute contains no standards by which to determine the appropriateness of the PLA (¶ 20) and the CT Page 9586 commissioner has not promulgated any regulations establishing such standards (¶ 21).
"The most often cited rule governing the constitutionality of legislative delegations in Connecticut comes from the 1940 case of State v. Stoddard, 126 Conn. 623, 13 A.2d 586
(1940)." Bottone v. Westport, 209 Conn. 652. 659,553 A.2d 576 (1989). "A Legislature, in creating a law complete in itself and designed to accomplish a particular purpose. may expressly authorize an administrative agency to fill up the details by prescribing rules and regulations for the operation and enforcement of the law. In order to render admissible such delegation of legislative power . . . it is necessary that the statute declare a legislative policy, establish primary standards for carrying it out. or lay down an intelligible principle to which the administrative officer or body must conform. . . ."State v. Stoddard, supra, 126 Conn. 628. "[S]ince the law-making function is vested exclusively in the legislative department, the Legislature cannot delegate the law-making power to any other department or agency." Id., 627.
"As the complexity of economic and governmental conditions increases, the modern tendency is liberal in approving broad regulator; standards so as to facilitate the operational functions of administrative boards or commissions." (Internal quotation marks omitted.) Aunt Hack Ridge Estate, Inc. v.Planning Commissioner, 160 Conn. 109, 115, 273 A.2d 880
(1970). "If the legislature fails to prescribe the limits of the power delegated with reasonable clarity, or the power is too broad, its attempt to delegate is a nullity . . . [A]gencies must . . . act according to the strict statutory authority." (Citations omitted.) State v. White, 204 Conn. 410,419, 528 A.2d 811 (1987).
The commissioner points out that our Supreme Court has found a clearly expressed policy in these statutes, citing ArdmareConstruction Co. v. Freedman, 191 Conn. 497. 504,467 A.2d 674 (1983) ("to guard against such evils as favoritism, fraud or corruption . . ., to secure the best product at the lowest price, . . . to benefit the taxpayer. . . .") He further argues that delegation of the authority to determine the details of public works projects is necessary in light of the complexity of construction projects, requiring attention to details that the legislature cannot administer. CT Page 9587
The plaintiffs do not claim that the statute is vague due to lack of details, but because it delegates to the commissioner the decision whether or not to use union labor. This claim is supported by factual allegations that the commissioner did not make any findings prior to adopting the PLA, accepted the draft PLA and model resolution proposed by BCTC, and showed no objective reasons to believe that the PLA was in the public interest. These allegations fall squarely within the rule ofState v. Stoddard, supra, 126 Conn. 628.
Whether there are standards outlined in the statutes to promote fairness in the bidding process that are sufficient to protect against arbitrary and biased decisions is a question to be determined after full consideration of the statutory scheme. See State v. Anonymous, 179 Conn. 155, 166-67,425 A.2d 939 (1979) (statutory scheme for termination of parental rights provided protection from arbitrary actions by social workers in bringing petitions). Given the controversial nature of mandating labor agreements, as evidenced by this case and those in other states, a close scrutiny of the statute in the context of this case would be in order. Therefore, count two states a sufficient claim of unlawful delegation of authority not barred by sovereign immunity.
The third count raises a claim of infringement of the constitutionally protected rights of free speech and association under the constitutions of the United States and Connecticut. "The allegations of such a complaint and the factual underpinnings . . . must clearly demonstrate an incursion upon constitutionally protected interests." Barde v. Board ofTrustees, 207 Conn. 59, 64, 539 A.2d 1000 (1988). The test is whether or not sufficient facts of unconstitutional activity have been alleged to overcome the sovereign immunity bar.Wiley v. Lloyd, 4 Conn. App. 447, 451, 495 A.2d 1082
(1985). The commissioner argues that the allegations do not establish a substantial constitutional claim.
The plaintiffs allege that (1) the commissioner is interfering with their rights "not to associate with unions which are signatories to the collective bargaining agreements which underlie the PLA" (¶ 18); (2) bidders "are required by the terms of the PLA to agree to make payments to the Locals which will be used by the Locals to further the philosophical and political goals of the Locals and their parent and associated organizations" (¶ 19); (3) "[t]he making of such payments, CT Page 9588 which are a precondition to eligibility to bid on this public project, violates the political principles which caused the members to join the plaintiff Association and would therefore violate the rights of the Association and its members guaranteed by the constitutions of the United States and the State of Connecticut" (¶ 20); and (4) the conduct of the defendant has "denied the plaintiffs the freedom, absent governmental coercion, to choose whether to associate with the BCTC and the Local Unions who are signatories to the PLA" (¶ 21).
The commissioner relies on Barde v. Board ofTrustees, supra, 207 Conn. 59, to support his contention that the plaintiffs have not adequately pleaded a constitutional violation. In Barde, the plaintiff, an accounting professor, claimed due process and equal protection violations by his employer in not promoting him on par with similarly situated professors in his department. His due process claim was dismissed because his allegations were based on a "unilateral expectation of benefits [which was] simply not enough to create a constitutionally protected property interest within the meaning of the fourteenth amendment." Id., 65. Similarly. his equal protection claims were insufficient because his allegation of being similarly situated to others in his department was refuted by affidavits that "he was not in fact in the same circumstances as the college deans referred to in his complaint" making it "evident that the factual basis for the equal protection claim simply did not exist." Id., 65-66. The court concluded that "the constitutional claims have not been established and thus the doctrine of sovereign immunity operates as a bar to subject matter jurisdiction." Id., 66. Barde merely stands for the rule that the factual allegations must be sufficient and may be disputed by affidavits. In the present case, no affidavits were submitted with the motion to dismiss and the record does not present any undisputed evidence to counter the allegations. Therefore, the allegations are presumed to be true. PamelaB. v. Ment, supra, 244 Conn. 308.
The scope of the constitutional right of association in this context was outlined by the United States Supreme Court inAbood v. Detroit Board of Education, 431 U.S. 209,97 S.Ct. 1782, 52L.Ed.2d 261, reg. denied, 433 U.S. 915,97 S.Ct. 2989, 53 L.Ed.2d 1102 (1977). In Abood, the court reiterated earlier holdings that a labor agreement must be written to prevent "compulsory subsidization of ideological activity by employees who object thereto without restricting the CT Page 9589 Union's ability to require every employee to contribute to the cost of collective bargaining activity." Id., 237. The burden is on the union to show the proportion of political to total union expenditures and return to the dissenting employee a pro rata share of his contributions. The court held that the employer could not require employees to contribute to the support of an ideological cause he may appose as a condition of holding a public school teacher. Id., 232-37.
The commissioner argues that the money collected by the contractor on this project will go only to collective bargaining making the PLA consistent with Abood. This argument is unavailing for two reasons. First, the court cannot determine from the record before it whether this PLA complies with that standard.[7] More telling, however, is the procedural posture of Abood. The principle question in Abood was the same question at issue in the present case: whether the general allegations of the complaint established a cause of action under the first and fourteenth amendments. Id., 237. The Supreme Court found that they did. "The employees indicated in their pleadings that they opposed ideological expenditures of any sort that are unrelated to collective bargaining. To require greater specificity would confront an individual employee with the dilemma of relinquishing either his right to withhold his support of ideological causes to which he objects or his freedom to maintain his own beliefs without public discourse." (Emphasis in original.) Id., 241.
The allegations in count three are consistent with those upheld in Abood. If proven. they show that in order to be eligible to bid on this public works project. the plaintiff contractors would be required to use union workers and collect money to support a broad range of union activities inimical to their political beliefs, and non-union workers would be required to contribute money to support ideological expenditures unrelated to collective bargaining. The allegations of count three establish a claim of an infringement on the plaintiffs rights of free speech and association.
The plaintiffs complaint includes sufficient factual allegations to overcome the bar of sovereign immunity. Accordingly, the motion to dismiss is denied in light of the significant constitutional questions raised, the determination of which is manifestly in the public interest. CT Page 9590
So Ordered.
John J. Langenbach Superior Court Judge