******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

IN RE QUIDANNY L.*
(AC 37383)

Gruendel, Beach and Sullivan, Js.

*Argued May 11—officially released August 6, 2015***

(Appeal from Superior Court, judicial district of New Britain, Juvenile Matters, Cohn, J.)

*Michael S. Taylor*, assigned counsel, with whom was *James P. Sexton*, assigned counsel, for the appellant (respondent mother).

*Benjamin Zivyon*, assistant attorney general, with whom were *Elizabeth H. Bannon*, assistant attorney general, and, on the brief, *George Jepsen*, attorney general, for the appellee (petitioner).

*Robert W. Lewonka*, for the minor child.

*Opinion*

GRUENDEL, J. The respondent mother appeals from the judgment of the trial court terminating her parental rights as to Q, her minor child.[1] She contends that the court improperly (1) determined that her attempted suffocation of Q constituted an act of parental commission pursuant to General Statutes § 17a-112 (j) (3) (C), and (2) found that the petitioner, the Commissioner of Children and Families, had proven that statutory ground by clear and convincing evidence. We affirm the judgment of the trial court.

The relevant facts are gleaned from the court's memorandum of decision and the undisputed evidence in the record before us. On November 30, 2013, the respondent was sixteen years old and her infant son, Q, was thirteen months old. At that time, they were living at the home of the respondent's mother. Using her cell phone, the respondent sent a video to Q's father, who resided in Florida. In that video, the respondent placed a blanket over Q and then proceeded to sit on his head, as the infant kicked and squirmed in an effort to free himself. The respondent then used her cell phone to send a text message to Q's father that stated, "This what you want?"

The father immediately forwarded the video message to the respondent's mother, who rushed to the respondent's bedroom only to find the door locked and Q crying. The respondent's mother then contacted the police to report that the respondent was "locked in her bedroom with her one year old infant and may be purposely suffocating the infant."[2] Three police officers arrived at the home within minutes. When their entreaties to unlock the bedroom door went unanswered, the officers forcibly entered the room. They then encountered the respondent squeezing Q tightly, such that Q was turning blue and appeared to be in great distress. When the respondent refused to release the infant, the officers engaged in a physical struggle to free Q from her grasp. Once their efforts proved successful, the respondent was handcuffed and Q was transported to a nearby hospital, where he did not require medical care. As a result of the foregoing, the respondent was arrested and charged with attempt to commit murder with special circumstances, attempt to commit assault in the first degree, and risk of injury to a child. In the criminal proceeding that followed, the Superior Court ordered that there be no contact between the respondent and Q. At trial, the respondent testified that she was in the process of entering a nolo contendere plea of guilty in that criminal proceeding to one count of risk of injury to a child.

Following the events of November 30, 2013, the petitioner invoked an administrative ninety-six hour hold, thereby removing Q from the care and custody of the respondent. The petitioner thereafter obtained an ex

parte order of temporary custody of Q, a finding that reasonable efforts to reunify the respondent and Q were not required, and an adjudication that Q had been neglected. None of those determinations are at issue in this appeal.

On February 10, 2014, the petitioner moved to terminate the respondent's parental rights with respect to Q. The petition asserted that Q had been denied the care, guidance or control necessary for his physical, educational, moral or emotional well-being due to the respondent's acts of parental commission or omission. A two day trial followed, at which two police officers, a social worker with the Department of Children and Families (department), and the respondent testified. In its memorandum of decision dated November 20, 2014, the court found by clear and convincing evidence that the petitioner had proven the statutory ground alleged. The court further found that it was in Q's best interest to terminate the parental rights of the respondent. Accordingly, the court rendered judgment terminating her parental rights pursuant to § 17a-112 (j) (3) (C). From that judgment, the respondent now appeals.

I

The respondent claims that the court improperly determined that her attempted suffocation of her infant child constituted an act of parental commission pursuant to § 17a-112 (j) (3) (C). More specifically, she contends that a court cannot conclude that such an act constitutes severe physical abuse, as that terminology is used therein, absent proof that the child suffered severe physical injury. We disagree.

The proper interpretation of § 17a-112 (j) (3) (C) presents a question of statutory construction, over which our review is plenary. See *In re Justice V.*, 111 Conn. App. 500, 506, 959 A.2d 1063 (2008), cert. denied, 290 Conn. 911, 964 A.2d 545 (2009). "In making such determinations, we are guided by fundamental principles of statutory construction. See General Statutes § 1-2z; *Testa* v. *Geressy*, 286 Conn. 291, 308, 943 A.2d 1075 (2008) ([o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature . . . .)." (Footnote omitted; internal quotation marks omitted.) *In re Matthew F.*, 297 Conn. 673, 688, 4 A.3d 248 (2010); see also *In re Emoni W.*, 305 Conn. 723, 733, 48 A.3d 1 (2012). "We recognize that terms in a statute are to be assigned their ordinary meaning, unless context dictates otherwise . . . . *Wiseman* v. *Armstrong*, 295 Conn. 94, 100, 989 A.2d 1027 (2010); see also General Statutes § 1-1 (a) ([i]n the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language). In addition, [w]e often have stated that, when the ordinary meaning [of a word or phrase] leaves no room for ambiguity . . . the mere fact that the parties advance different interpretations of the language in

question does not necessitate a conclusion that the language is ambiguous. . . . *Picco* v. *Voluntown*, 295 Conn. 141, 150, 989 A.2d 593 (2010)." (Internal quotation marks omitted.) *In re Emoni W.*, supra, 733–34.

We begin with the text of the statute. Section 17a-112 (j) (3) (C) provides in relevant part that "[t]he Superior Court . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence that . . . the child has been denied, by reason of an act or acts of parental commission or omission including, but not limited to, sexual molestation or exploitation, severe physical abuse or a pattern of abuse, the care, guidance or control necessary for the child's physical, educational, moral or emotional well-being, except that nonaccidental or inadequately explained serious physical injury to a child shall constitute prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights . . . ." The statute thus specifies, as a ground for termination, acts of parental commission or omission that result in the denial of the care, guidance or control necessary for the child's well-being. Section 17a-112 (j) (3) (C) further provides that such acts include "but [are] not limited to, sexual molestation or exploitation, severe physical abuse or a pattern of abuse . . . ."[3] We conclude that § 17a-112 (j) (3) (C) plainly encompasses the act of a parent who attempts to suffocate a child, causing the child to turn blue. That act of parental commission is a quintessential example of severe physical abuse that compromises a child's physical and emotional well-being.

The respondent nonetheless argues that a termination petition predicated on allegations of severe physical abuse cannot be granted unless severe physical injury to the child is proven. Section 17a-112 (j) (3) (C) contains no such requirement. Although the respondent devotes considerable attention to the final clause of subparagraph (C) of that statute, which provides in relevant part that "nonaccidental or inadequately explained serious physical injury to a child shall constitute prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights," that clause merely clarifies when the evidentiary burden properly is placed on a respondent. As this court explained many years ago, "[t]he language regarding prima facie evidence shifts the burden from the petitioner to the parent to show why a child with clear evidence of physical injury that is unexplained should not be permanently removed from that parent's care. The language does not limit the grounds to acts resulting in physical injury." *In re Sean H.*, 24 Conn. App. 135, 144, 586 A.2d 1171, cert. denied, 218 Conn. 904, 588 A.2d 1087 (1991). Apart from its concluding clause, § 17a-112 (j) (3) (C) does not contain any reference to the term "injury," never mind a serious physical one.

To be sure, that statutory ground for termination of parental rights contemplates harm to a child's well-being. Accordingly, to demonstrate an act of parental commission thereunder, the petitioner must establish harm to the physical, educational, moral, or emotional well-being of the child in question. As our prior decisions have recognized, that burden may be satisfied by proof that a child suffered a significant physical or emotional injury. See *In re Kezia M.*, 33 Conn. App. 12, 19, 632 A.2d 1122 (statute "authorizes the termination of parental rights where specific acts of parental commission or omission have caused serious physical or emotional injury to the child"), cert. denied, 228 Conn. 915, 636 A.2d 847 (1993); *In re Kelly S.*, 29 Conn. App. 600, 614, 616 A.2d 1161 (1992) (noting that statute "does not permit the termination of parental rights based on speculation as to what acts may befall a child" and emphasizing that "[n]o injury has befallen [the child] as a result of acts of commission or omission by her parents"); *In re Sean H.*, supra, 24 Conn. App. 144 (statutory ground not limited to acts that result in serious physical injury and also encompasses acts that result in serious emotional injury to child). Nevertheless, nothing in our decisional law or the language of § 17a-112 (j) (3) (C) suggests that its application is confined to acts resulting in such physical or emotional injury. To the contrary, the plain language of that statutory ground also encompasses acts of parental commission that result in significant harm to the educational and moral well-being of a child.

At its essence, the respondent's claim asks us to rewrite § 17a-112 (j) (3) (C) so as to insert a provision requiring proof of serious physical injury in cases of physical abuse. That we refuse to do. We are obligated to "construe a statute as written. . . . Courts may not by construction supply omissions . . . or add exceptions . . . . The intent of the legislature . . . is to be found not in what the legislature meant to say, but in the meaning of what it did say. . . . It is axiomatic that the court itself cannot rewrite a statute . . . . That is a function of the legislature." (Internal quotation marks omitted.) *Doe* v. *Norwich Roman Catholic Diocesan Corp.*, 279 Conn. 207, 216, 901 A.2d 673 (2006); see also *Lucarelli* v. *State*, 16 Conn. App. 65, 70, 546 A.2d 940 (1988) ("[c]ourts must interpret statutes as they are written . . . and cannot, by judicial construction, read into them provisions which are not clearly stated" [citation omitted]).

To paraphrase the words of our Supreme Court in *State* v. *Anonymous*, 179 Conn. 155, 164, 425 A.2d 939 (1979), the evil to be avoided by § 17a-112 (j) (3) (C) is parental conduct that denies a child the care, guidance or control necessary to his well-being. The parental conduct at issue in the present case is such an evil. Here, the court found that Q suffered both physical

harm—turning blue as a result of the respondent's impairment of his respiration[4]—as well as emotional harm from the act of his mother attempting to suffocate him, specifically noting that "[t]here are psychological effects that last after a physical assault."[5] This is not a case in which "[n]o injury has befallen" Q as a result of acts of commission or omission by his parent. *In re Kezia M.*, supra, 33 Conn. App. 20; *In re Kelly S.*, supra, 29 Conn. App. 614. This also is not a case in which the respondent "never presented any threat to the physical and emotional safety" of Q; *In re Sean H.*, supra, 24 Conn. App. 145; nor has the respondent so argued in this appeal. We believe the actions of the respondent, as documented more fully in part II of this opinion, clearly constitute severe physical abuse as that language is used in § 17a-112 (j) (3) (C). We therefore reject the respondent's claim that § 17a-112 (j) (3) (C) is not implicated when a parent attempts to suffocate a child and causes the child to turn blue, but no further physical injury results.

II

The respondent also claims that the court improperly found that the petitioner had proven that statutory ground by clear and convincing evidence. "Our standard of review on appeal from a termination of parental rights is whether the challenged findings are clearly erroneous. . . . It is axiomatic that a trial court's factual findings are accorded great deference. . . . A finding is clearly erroneous when either there is no evidence in the record to support it, or the reviewing court is left with the definite and firm conviction that a mistake has been made. . . .

"On appeal, [an appellate court's] function is to determine whether a trial court's conclusion was factually supported and legally correct. . . . In doing so, however, [g]reat weight is given to the judgment of the trial court because of [the trial court's] opportunity to observe the parties and the evidence. . . . [An appellate court does] not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [Rather] every reasonable presumption is made in favor of the trial court's ruling." (Citations omitted; internal quotation marks omitted.) *In re Jorden R.*, 293 Conn. 539, 558–59, 979 A.2d 469 (2009).

The record before us contains ample evidence substantiating the court's finding that the respondent engaged in acts of parental commission that denied Q the care, guidance or control necessary for his physical, educational, moral or emotional well-being. The court heard testimony from Kathryn Levy, a social worker with the department who was assigned to the respondent's case. Levy testified that she viewed the video that the respondent sent to Q's father on November 30, 2013. She described its content as follows: "There was

a video of [the respondent] putting a blanket over [Q's] head and sitting on top of [him]. . . . [Q] was underneath [the respondent]. You could see his body—the lower extremities of his body twisting and turning trying to free himself. It appeared in the video that his upper extremities were constricted and he wasn't able to move and he appeared to be crying in the video." In addition, an affidavit prepared by Eric Hundley, a social worker at the department, was admitted into evidence. In that affidavit, Hundley avers that he observed the video, which "is approximately fifteen seconds in duration. The video captures what appears to be a person sitting upon the head of [Q], who also has a blanket draped over his head. [Q] is observed in the video squirming, with his head and body lacking asynchronism, and [Q's] head area having the least amount of movement. In addition, [Q] could be heard crying as he twisted and turned in between the legs belonging to [the respondent] . . . ." In his trial testimony, Officer Kyle Macci of the New Britain Police Department provided a similar description of what he observed when viewing that video, stating that he saw the respondent "on her knees on the bed literally sitting on the baby's face and the baby is like—the baby's face is underneath her, the baby's body is outwards and the baby is kicking and squirming and going like this with [his] hands. . . . Like trying to get away and obviously suffering."

Macci also provided firsthand testimony as to the respondent's conduct when the officers responded to her home on the date in question. He testified that when he entered the respondent's bedroom, "[t]he baby was definitely in distress, obviously, squirming and [he] looked blue as if [he] was oxygen deprived and [the respondent] was holding onto the baby also with her hands. . . . I asked her to let go of the baby because I didn't want to use force and potentially hurt [him] . . . . There were three [officers] there and I was hoping she would comply just by our mere presence but she did not, so we had to go actually hands on and use force and I remember that she was trying with all of her might to strangle this baby . . . ." Macci further testified that the respondent applied a "significant amount of force . . . on the baby's chest and neck area" and that Q "was struggling to breathe and was making gasping noises" until the officers finally freed him from the respondent's grasp.

The police report on the November 30, 2013 incident, which was admitted into evidence at trial, likewise indicates that when the officers entered the bedroom the respondent was "holding the baby with her arm around [his] neck and squeezing it. The baby appeared to be in serious distress. [The officers] jumped on the bed and struggled with [the respondent] in an attempt to save the baby. [The respondent] was squeezing the baby so hard that the baby was in serious distress and was unable to take in air. [The officers] finally broke [the

respondent's] arms free from [Q] allowing [him] to finally gasp for air."

In its memorandum of decision, the court expressly credited both that police report and Macci's testimony, as was its exclusive prerogative. As this court has noted, "[i]t is the [fact finder's] exclusive province to weigh the conflicting evidence and to determine the credibility of witnesses. . . . The [fact finder] can . . . decide what—all, none, or some—of a witness' testimony to accept or reject. . . . As a corollary, [q]uestions of whether to believe or to disbelieve a competent witness are beyond our review. As a reviewing court, we may not retry the case or pass on the credibility of witnesses. . . . [W]e must defer to the [finder] of fact's assessment of the credibility of the witnesses that is made on the basis of its firsthand observation of their conduct, demeanor and attitude." (Citation omitted; internal quotation marks omitted.) *State* v. *Altayeb*, 126 Conn. App. 383, 387–88, 11 A.3d 1122, cert. denied, 300 Conn. 927, 15 A.3d 628 (2011); see also *Schoenborn* v. *Schoenborn*, 144 Conn. App. 846, 859, 74 A.3d 482 (2013) ("this court cannot pass on issues of credibility and must defer to the trier of fact's assessment thereof"); *State* v. *Gene C.*, 140 Conn. App. 241, 247, 57 A.3d 885 ("[c]redibility determinations are the exclusive province of the . . . fact finder, which we refuse to disturb"), cert. denied, 308 Conn. 928, 64 A.3d 120 (2013).

The account of the respondent's conduct provided in the police report and Macci's testimony, as well as the testimonial and documentary evidence from the department's social workers, substantiates the court's finding that the respondent committed acts that denied Q the care, guidance or control necessary for his physical, educational, moral or emotional well-being. Indulging every reasonable presumption in favor of the trial court's ruling, we cannot say that the court erroneously concluded that the petitioner had proven an act of parental commission pursuant to § 17a-112 (j) (3) (C) by clear and convincing evidence.

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** August 6, 2015, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

1 The court also rendered a consensual termination of the parental rights of Q's father, whom we refer to by that designation. Because he is not a party to this appeal, we refer to the respondent mother as the respondent. We also note that, pursuant to Practice Book § 67-13, the attorney for the minor child filed a statement adopting the brief of the petitioner in this appeal.

2 The court was presented with evidence, in the form of an affidavit prepared on November 30, 2013, by Eric Hundley, a social worker at the Department of Children and Families, regarding certain events that transpired earlier that day, which sheds light on the decision of the respondent's

mother to contact the police. That affidavit indicated that the respondent's sister was playing with Q in the living room of the family's home when the respondent "entered and stated that [Q's father had] told her he wished she died. . . . [The respondent] then grabbed [Q] in a harsh manner underneath his arm pits, hoisting him up into the air, then went into her bedroom. [The respondent's sister then] heard what sounded like a smack, and heard [Q] cry out. . . . [The respondent] had locked her bedroom door at this point." When the respondent's sister summoned her mother, the respondent's mother ran up the stairs and said to the respondent, " 'I hope you are not hitting the baby.' " The respondent then replied, " 'he came out my pussy, so I can do what I want.' "

[3] Section 17a-112 (j) (3) (C) unambiguously indicates that those three categories are illustrative of, but not the exclusive, acts of parental commission or omission qualifying thereunder. We note that our Supreme Court upheld a challenge to the constitutionality of the predecessor to that statutory ground for termination of parental rights, General Statutes (Rev. to 1977) § 45-61f, on vagueness grounds, emphasizing that "the process of parenting itself is multifaceted and encompasses all of life's activities. In view of the diversity of human nature, backgrounds and capabilities, and the differing aspirations of families in our society, it would be impossible to delineate specific conduct as acceptable or unacceptable." *State* v. *Anonymous*, 179 Conn. 155, 164–65, 425 A.2d 939 (1979).

[4] At oral argument before this court, the respondent acknowledged that the trial court specifically found that Q suffered a physical injury when he turned blue as a result of her impairment of his respiration. She nevertheless posits that such temporary harm is insufficient to establish an act of parental commission pursuant § 17a-112 (j) (3) (C), and that a more lasting injury is required. In its memorandum of decision, the court rejected that argument, emphasizing that "there is no requirement [under § 17a-112 (j) (3) (C)] that such injury last after the incident." We concur.

[5] In her reply brief, the respondent argues that "there were no facts" that support a finding of an emotional injury to Q, a thirteen month old child. We disagree. The trial court, as fact finder, reasonably could infer such an injury from the testimony provided by social workers Kathryn Levy and Eric Hundley and Officer Kyle Macci of the New Britain Police Department, as discussed more fully in part II of this opinion.