MEMORANDUM OF DECISION
On June 26, 2000; the Commissioner of the Department of Children and Families (DCF) filed a petition to terminate the parental rights of Sharon W. and Andrew M., the unmarried biological parents to their daughter, Anndre'ya W., born October 17, 1991. This is the second termination petition filed by DCF and for the reasons stated below the court grants the termination petition with regard to the father, Andrew M., and continues the matter for the mother.
Termination of parental rights proceeds in two stages: adjudication and disposition. In the adjudicatory phase, the court must determine whether the proof provides clear and convincing evidence that any one of the grounds pleaded exists to terminate parental rights as of the date of the filing of the petition or last amendment to it. In re Joshua Z.,26 Conn. App. 58, 63, 597 A.2d 842 (1991), cert. denied 221 Conn. 901
(1992). If at least one pleaded ground to terminate is found, the court must then consider whether the facts, as of the last day of trial, establish, by clear and convincing evidence, that termination is in the child's best interest.
Procedurally, the evidence as to both adjudicatory and dispositional phases is heard at the same trial without first determining if the state has proven a statutory ground for adjudication before consideration of the dispositional question. State v. Anonymous, 179 Conn. 155, 172-173,425 A.2d 939 (1979); In re Juvenile Appeal (84-BC), 194 Conn. 252, 258,479 A.2d 1204 (1984); In re Nicolina T., 9 Conn. App. 598, 602,520 A.2d 639, cert. denied, 203 Conn. 804, 525 A.2d 519 (1987); In reEmmanuel M., 43 Conn. Sup. 108, 113, 648 A.2d 904 aff'd 35 Conn. App. 276,278, 648 A.2d 881, cert. denied, 231 Conn. 915, 648 A.2d 151 (1994).
 I FACTS
The court finds the following facts and credits the following evidence.
A. Procedural History
CT Page 8624
On May 16, 1995, DCF filed neglect petitions and sought an ex parte order of temporary custody alleging that Anndre'ya was neglected in that she had been permitted to live under conditions, circumstances or association injurious to her well-being. The order was granted on May 26, 1995 and on September 22, 1995, the court adjudicated Anndre'ya neglected and committed her to the care and custody of DCF. (Keller, J.)
On March 18, 1999, the court found that continuing efforts to reunite the family were no longer appropriate as to both the mother and the father. (Dyer, J.) On July 8, 1999, DCF filed the first petition for termination of parental rights of the parents. On March 14, 2000, the mother consented to termination of her parental rights which consent was contingent upon the father's parental rights being terminated also. The court accepted her consent conditionally and it was to have no force or effect if the child's father's parental rights were not terminated at trial.
With regard to the father, that petition alleged that there was no ongoing parent-child relationship that ordinarily develops as a result of a parent having met on a continuing basis, the physical, emotional, moral, or educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child. General Statutes § 17a-112 (c)(3)(D). The petitioner also alleged that the child had been abandoned in the sense that the father had failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. General Statutes § 17a-112 (c)(3)(A). The court dismissed that termination petition against the father, Andrew M., finding that the petitioner-had not met its burden by clear and convincing evidence as to either count and accordingly nullified the conditional consent of the mother. (Rogers, J.)
DCF then filed the present petition on June 26, 2000, alleging as to both the mother and the father the ground of failure to rehabilitate. General Statutes § 17a-112 (c)(3)(B). The trial proceeded against the father as the mother through her counsel represented she will consent to the termination of her parental rights conditioned upon the court entering a termination against the father. At the judicial pre-trial held on September 12, 2000, the court appointed an attorney to represent Andrew M. as he is incarcerated in a federal penitentiary in Pennsylvania and the trial was scheduled to commence on October 30, 2000.[2]
Prior to the commencement of the trial, the father's attorney filed a motion to withdraw as his attorney stating that Andrew asked her to withdraw from the case. The court denied the attorney's motion to withdraw and ordered her to be present and ready for trial.[3] Because CT Page 8625 Andrew M. is incarcerated in Pennsylvania in a federal penitentiary, he was not present at trial but attended via teleconferencing. At the end of each day of trial, the court ordered a transcript of the day's proceedings which was provided to Andrew and his attorney. The court continued the trial for three months to allow Andrew to review the transcripts with his attorney.[4]
 B. The father — Andrew M.
The court at the request of the petitioner and by agreement of the parties the court judicially noted the memorandum of decision in the earlier termination proceeding involving Anndre'ya W.
Andrew M. has been incarcerated since July 13, 1993, when Anndre'ya was twenty-one (21) months old. In 1996 he was convicted of conspiracy to possess with intent to distribute cocaine and cocaine base ("crack"), possession with intent to distribute cocaine and crack, possession of a firearm by a prohibited person and money laundering. Judge Alfred V. Covello imposed a sentence of three hundred and thirty six (336) months. The district court after hearing imposed a four-level upward adjustment and sentenced Andrew M. to three hundred and sixty (360) months. After his motion to vacate the sentence was granted, Andrew received a two level downward adjustment on the ground of post-arrest rehabilitation and was resentenced to three hundred and thirty-six (336) months imprisonment and a ten-year term of supervised release.[5] This makes his earliest release date 2017 at which time his daughter Anndre'ya will be 26 years old.
Andrew was not offered any direct services by DCF when Anndre'ya was initially removed in May, 1995, as he was already in federal custody and the plan was reunification with the mother. He was offered visitation with his child on a regular basis while he was incarcerated in Connecticut. Between March, 1996, and November, 1996, Andrew did not have any contact with DCF and DCF did not know his whereabouts, but in November, 1996, he wrote DCF informing that he had been transferred to a federal prison in Pennsylvania. Social Worker Freda Griffin did discuss with Andrew the services available while he was in Pennsylvania and attempted to speak to his counselor at the prison. However the counselor would not speak to her due to confidentiality issues. Griffin never received any requests from Andrew. He was told by Griffin that he needed to participate in substance abuse, anger management, and parenting classes. He did complete a parenting class, however he did not feel he had the need for substance abuse prevention classes or anger management or individual counseling.[6] Andrew also has participated in a number of bible study courses and has been ordained with all rights and privileges to perform all duties of the ministry in the Universal Life CT Page 8626 Church. (Father's Exh. 6).
Andrew has maintained some contact with his daughter through telephone calls, letters and cards. He is allowed to call the foster home where Anndre'ya resides and speaks directly to her. In the past five years he has sent her books on two occasions, and has sent her money on two occasions. Over the last five years he has sent her approximately eight cards.
Although Andrew has stated he has undergone some sort of spiritual transformation, he has failed to be honest with his daughter and tell her the truth about his incarceration. He has not told her the extent of how long he will be away from her. She even thought that he was living with another female and she did not like Anndre'ya and that is why she had not seen her father. Andrew has no plan for his daughter if this court did not grant the termination petition. He believes that when he "gets out" he could get custody of her, failing to realize that she will be 26 years old at that time. He also proposes his family in Jamaica taking custody of Anndre'ya. However, during one phone call when he proposed this to her, she became hysterical and the foster mother had to end the conversation. One very important fact that Andrew has failed to address is that whenever he is released from prison, there is a strong likelihood that he would face deportation proceedings as he is not a United States citizen.
C. Anndre'ya W.
Anndre'ya W. was born prematurely on October 1991. Although she has a history of asthma, she has not required any intervention since placement in DCF's custody. She has been in foster care since her removal from her mother's home on May 9, 1995. She was initially placed with a foster family in Plainville and was moved to her current foster home in June, 1995, and resides with her foster parents, Mr. and Mrs. M., her foster siblings, and her maternal halfsister, Alexis C.
Anndre'ya is a fourth grader at Annie Fisher School and continues to make steady academic progress. She experienced some difficulties in her earlier school years, and her progress is no doubt due to the love and devotion she receives from her foster mother, Mrs. M., who attended each day of trial and testified. She expressed her strong desire to keep Anndre'ya and to adopt her. Anndre'ya calls her "mommy" and Mr. M "daddy", although she knows that Andrew is her father. Even if the court were not to grant the termination petition, Mrs. M. would love and welcome Anndre'ya in her home, but her concern is that the parents would still be able to interject and she is not willing to have her hands tied in that manner. CT Page 8627
Her real concern is that Andrew is looking at his family to care for Anndre'ya. This is alarming to her that someone could come and take Anndre'ya back to Jamaica. But as she so aptly stated ". . . if those persons were interested in Anndre'ya, I would have heard from them in five years." (T., 12/1/00, 49.) She has always accepted and welcomed communication from Andrew through phone calls and through cards and letters, however, Mrs. M. has a different recollection on the number of calls, cards and letters than Andrew. She screens his letters and on one occasion did not give Anndre'ya one of the letters sent by her father because of its inappropriate references to this nine year old girl being a mature woman and doing the things that single women have to do. The sexual overtone to the letter Mrs. M. believed to be wholly inappropriate and destroyed it.
Anndre'ya has become accustomed to the, stable lifestyle of the M. family and functions as part of the family unit. She enjoys their family vacations to Florida, Michigan and New York. She is bonded to her foster sister and to her half-sibling, whom the M.'s have adopted. Mr. and Mrs. M. are willing to allow Andrew to have contact with his daughter even if his parental rights are terminated.[7]
 II ADJUDICATION A. Reunification
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts, provided that this finding is not required if the court has determined at hearing . . . that such efforts are not appropriate. General Statutes § 17a-112(j)(1). The court made such findings on March 18, 1999. (Dyer, J.)
B. Statutory Ground
Each statutory basis set out in General Statutes § 17a-112 (b) is an independent ground for termination. In re Baby Girl B.,224 Conn. 263, 618 A.2d 1 (1992). The petitioner is required to prove one or more of the three grounds alleged in its petition by clear and convincing evidence. DCF has alleged the ground of failure to rehabilitate as to Andrew M. The court finds that DCF has proven failure to rehabilitate against the father by clear and convincing evidence. CT Page 8628
Failure to Rehabilitate — General Statutes § 17a-112(c)(B)
If the parents of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding fail to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, they could assume a responsible position in the life of the child, grounds for termination exists. General Statutes § 17a-112 (b)(2). The court previously has found the child to have been "neglected," thus satisfying a statutory prerequisite.
The rest of the statute requires the court to find whether the facts encourage the belief that "such parent could assume a responsible position in the life of the child." General Statutes §17a-112(c)(3)(B). This portion of the statute requires the court to analyze a parent's rehabilitation "as it relates to the needs of the particular child" and determine whether such rehabilitation is foreseeable "within a reasonable time." In re Luis C., 210 Conn. 157, 167,554 A.2d 722 (1989); In re Hector L., 53 Conn. App. 359, 366-67,730 A.2d 106 (1999).
Personal rehabilitation, as used in the statute, refers to the restoration of a respondent to a constructive and useful role as a parent. In re Migdalia M., 6 Conn. App. 194, 203, 504 A.2d 533 (1986). The parent's compliance with expectation set after the adjudication of the neglect or uncared for case or the party's success in fulfilling service agreements entered into with DCF are relevant, but not dispositive, to the rehabilitation finding. In re Luis C., 210 Conn. 167-68. The ultimate question is whether the parent at the time of the filing of the termination petition is more able to resume the responsibilities of parents than he or she was at the time of the commitment. In re MichaelM., 29 Conn. App. 112, 126, 614 A.2d 832 (1992). Clearly and convincingly, the answer is "No."
Andrew's circumstances did not change between the September 1995 neglect adjudication and the June 2000 petition. He has been incarcerated since 1993 when his daughter was twenty-one (21) months old. He was obviously not the child's caretaker when she was taken into the custody of DCF in 1995 nor did he make any alterative arrangements for her care during his incarceration. When he is released from prison, Anndre'ya will be 26 years old. Even though he has been involved in several courses during his incarceration, none of these courses will provide him with an earlier release date. Although the majority of his courses are of a spiritual nature, Andrew has failed to learn one of the primary moral obligations — to tell the truth — which he has not done with his own daughter, neglecting to tell her the truth about his CT Page 8629 incarceration. His letters do not show an age appropriate understanding about the development of a pre-adolescent female child.
Whether the age and needs of the child do not support allowance of further time for the parent to rehabilitate must also be considered. Inre Luis C., supra, 210 Conn. 167. The reasonableness of the time period within which rehabilitation is sought to be accomplished is a question of fact for the court. In re Davon M., 16 Conn. App. 693, 696, 548 A.2d 1350
(1988). Also, in determining whether further allowance of a reasonable period of time would promote rehabilitation, a court can consider efforts made since the date of the filing of the petition to terminate parental rights. In re Sarah M., 19 Conn. App. 371, 377, 562 A.2d 566 (1989).
Considering Anndre'ya's age and her needs, she requires a permanent, structured, caring and nurturing environment that Andrew will not be able to offer her now or within a reasonable time in the future. She will be a grown woman by the time he is even able to walk freely, if he isn't deported upon his release. She should not have to languish in foster care. Giving Andrew additional time would not bring his performance as a parent within the acceptable statutory standards and Anndre'ya's permanent placement in a loving and nurturing home cannot be delayed. In re HectorL., 53 Conn. App. 359, 368, 730 A.2d 106 (1999). Thus, his own criminal activity has placed him in a situation that the court finds by clear and convincing evidence he will not be able to during the entire time of the child's minority assume a responsible position in the life of the child.
 III DISPOSITION OF THE TERMINATION PETITION
A. General Statutes Section 17a-112(e) Criteria
The court has found by clear and convincing evidence that the statutory grounds alleged by the petition for the termination of Andrew's parental rights have been proven and the court has previously found that DCF made reasonable efforts to reunify and that as of March 18, 1999, such efforts were no longer appropriate. Before making a decision whether or not to terminate the respondent father's parental rights, the court must now consider and make findings on each of the seven criteria set forth in General Statutes § 17a-112 (3). In re Romance N., 229 Conn. 345,355, 641 A.2d 378 (1994).
These criteria and this court's findings, which have been established by clear and convincing evidence, are as follows:
(1) "The timeliness; nature and extent of services offered or provided CT Page 8630 to the parent and the child by an agency to facilitate the reunion of the child with the parent."
Based on the foregoing discussion, the court finds that DCF provided foster care for Anndre'ya. It schedule visitation for Andrew and Anndre'ya. Although Andrew's incarceration prevented DCF from offering services to him directly, DCF did recommend which programs would be beneficial to him and were relevant to his needs. He refused to participate in those services recommended by DCF.
(2) "Whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the Federal Child Welfare Act of 1980, as amended."
The court finds that DCF provided visitation to the father while he was incarcerated in Connecticut, but that there was no reasonable possibility of reunification as a result of the length of time Andrew will be incarcerated. DCF's efforts were reasonable under the circumstances.
(3) "The terms of any court order entered into and agreed upon by any individual or agency and the parent, and the extent to which the parties have fulfilled their expectations."
Court ordered expectations were not entered for the father. He was made aware of the programs in which he should participate. He flatly refused to take the suggestions offered by Social Worker Griffin to participate in services she believed would be beneficial to his rehabilitation.
(4) The feelings and emotional ties of the child with respect to his parents, any guardians of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
Anndre'ya is bonded to her foster family. She refers to them as "mommy" and "daddy" and is bonded to her foster sibling. Although the court did review several letters she wrote to her father, the court was not presented with any credible evidence that she has any emotional ties to Andrew.
(5) "The age of the child."
Anndre'ya is presently 9 years old.
(6) "The effort the parent has made to adjust his circumstances, conduct or conditions to make it in the best interest of the child to return to his home in the foreseeable future including but not limited to CT Page 8631 (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent provided that the court may give weight to incidental visitations, communications or contributions and (b) the maintenance of regular contact or communications with the guardian or other custodian of the child."
Based on the foregoing discussion, the court finds that Andrew has not made reasonable efforts to rehabilitate himself. He cannot adjust his circumstances or conditions to make it in Anndre'ya's best interest to be placed in his care since he will be incarcerated until she is 26 years old. He will not in the near future be in a position to properly care for Anndre'ya.
(7) "The extent to which a parent has been prevented from maintaining a meaningful relationship by the unreasonable acts or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."
Andrew did not face any unreasonable interference from the mother or from any third person or from economic circumstances. His inability to care for his child or reunite with her is due to his actions in participating in serious crimes which have resulted in his incarceration for the next 16 years.
B. Best Interests of the Child
The court has found that the ground for termination of the parental rights of the biological father has been proven by clear and convincing evidence. The court has made the seven statutory findings required, which all weight in favor of termination being in this child's best interest. The court must now address the issue of whether the termination of parental rights is in the best interest of the child. General Statutes § 17a-112 (c)(2) The court can consider all events occurring through the close of the dispositional hearing. Practice Book §33-5.
The Appellate Court has "consistently head that to allow a child to languish in foster care is not in the child's best interest." In re DrewR., 47 Conn. App. 124, 131 (1997). The best interest of Anndre'ya clearly and convincingly favors termination of the parental rights of her father. Anndre'ya is strongly bonded to her foster parents with whom she has resided for six years and where her sibling resides. The foster parents are meeting her emotional needs in a stable setting.
Andrew is essentially no more than a person with whom Anndre'ya speaks with on occasion and receives a card or gift four to five times a year. CT Page 8632 He bears the responsibility of serious criminal convictions and incarceration in a federal penitentiary hundreds of miles from his daughter. She is fortunate to have been placed in a supportive foster family where she is doing tremendously well and with the second good fortune of being able to live with her sister. And the foster parents wish to adopt her as they have adopted her sister. To suggest that she be removed from this family to possibly move to Jamaica with persons she does not know or even to allow her to remain in this family but not allowing her to be adopted is the height of unfairness and selfishness.
 CONCLUSION
The court concludes from the clear and convincing evidence that it is in the best interests of Anndre'ya to have permanency and stability in her life and that it is in the best interests that her father's rights to her be terminated. This finding is made after considering the child's sense of time, her need for secure and permanent environment, the relationship the child has with her foster parents and the totality of the circumstances. In re Juvenile Appeal, (Anonymous), 177 Conn. 648,668, 420 A.2d 875 (1979).
The court orders that a termination of parental rights enter with respect to Andrew M., the father. The court orders that a date be set for the court to canvass the mother in order to accept her consent to the termination of parental rights. She has realized that the most loving and selfless act she can do at this time for her daughter is to allow her to be adopted by a loving and nurturing couple and reside permanently in that home.
 _____________________ SWIENTON, JUDGE