******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# IN RE AMIAS I. ET AL.*
## (SC 20671)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Kahn, Ecker and Keller, Js.

*Syllabus*

The respondent mother appealed from the judgments of the trial court terminating her parental rights with respect to her minor children, N, M, and D. The petitioner, the Commissioner of Children and Families, filed petitions to terminate the respondent parents' parental rights after the children had been adjudicated neglected, committed to the petitioner's custody, and placed in preadoptive foster homes. The removal of the children from the family home was precipitated in part by the hostile, paranoid, and erratic behavior of the respondent father, who had threatened a social worker, refused necessary medical treatment for D and special education services for N and M, and withdrew N and M from school. During the trial on the petitions, the attorney appointed to represent the children indicated that M and D wished to remain with their respective foster parents and that N wished to be reunited with the respondents, but only if they were together as a couple. In terminating the respondents' parental rights with respect to all three children, the trial court found, by clear and convincing evidence, that the Department of Children and Families had made reasonable efforts to reunify the children with the respondents but that the respondents had failed to achieve a sufficient degree of personal rehabilitation. The court also determined that termination of the respondents' parental rights was in the best interest of each child. On appeal from the trial court's judgments, the respondent mother claimed that the children had a constitutional right to conflict free representation and that the trial court had violated that right by failing to inquire into whether their attorney had a conflict of interest predicated on the fact that M and D wanted to remain in their respective foster homes, whereas N conditionally expressed an interest in being reunified with the respondents. *Held* that this court declined to determine whether children have a constitutional right to conflict free representation in child dependency proceedings and whether the children's competing goals regarding reunification with the respondents triggered the trial court's duty in the present case to inquire into their attorney's ability to advocate effectively on behalf of each child because, even if this court assumed that such a right existed, any violation of that right was harmless beyond a reasonable doubt, as the result of the trial would have been the same if the children had been represented by separate counsel: N's desire to be reunited with the respondents was contingent on the respondents being together as a couple at the time of the trial, and the record clearly indicated that there was no possibility that the court would have permitted the children to return to the respondent mother's care in light of its findings concerning her failure to rehabilitate, her lack of candor regarding her relationship with the respondent father, and her inability or unwillingness to protect the children from the father, with whom the court would not have permitted the children to live under any circumstances; moreover, this court declined the respondent mother's invitation to treat the trial court's failure to inquire into the attorney's alleged conflict of interest as a structural error subject to automatic reversal, as the significant differences between child dependency proceedings and other judicial proceedings, in addition to the policy of avoiding undue delays in connection with the long term placement of children, militated against applying a per se reversible error rule in child dependency cases; furthermore, a per se rule of automatic reversal was unwarranted when, as in the present case, the reviewing court can and does determine that the claimed error was harmless beyond a reasonable doubt, and reversal under the plain error doctrine was equally unwarranted given that the respondent mother could not demonstrate that the failure to reverse the trial court's judgments would result in manifest injustice.

Argued February 14—officially released June 29, 2022**

Petitions by the Commissioner of Children and Families to terminate the respondents' parental rights with respect to their minor children, brought to the Superior Court in the judicial district of Windham, Juvenile Matters at Willimantic, and tried to the court, *Carbonneau, J.*; judgments terminating the respondents' parental rights, from which the respondent mother appealed. *Affirmed.*

*Matthew C. Eagan*, assigned counsel, for the appellant (respondent mother).

*Clare Kindall*, solicitor general, with whom were *Evan O'Roark*, assistant attorney general, and, on the brief, *William Tong*, attorney general, and *Jillian Hira*, assistant attorney general, for the appellee (petitioner).

*Dana E. Clark*, for the minor children.

*Megan L. Wade* and *James P. Sexton* filed a brief for the Center for Children's Advocacy, Inc., as amicus curiae.

*Joshua Michtom*, assistant public defender, filed a brief for the Office of the Chief Public Defender as amicus curiae.

*Opinion*

KELLER, J. The respondent mother, Jennifer S., appeals[1] from the judgments of the trial court rendered in favor of the petitioner, the Commissioner of Children and Families, terminating her parental rights as to her three children, Anaya I., Amias I., and Adelyn I., due to her failure to achieve a sufficient degree of personal rehabilitation that would encourage the belief that, within a reasonable time, considering the ages and needs of her children, she could assume a responsible role in their lives.[2] The respondent claims that, in addition to their statutory right to conflict free counsel established by the legislature in General Statutes § 46b-129a (2) (A),[3] this court should hold that her children also had a procedural due process right to such counsel under the state and federal constitutions,[4] and that the trial court violated this right by failing to inquire into whether the attorney appointed to represent them, Dana E. Clark, had a conflict of interest due to the children's conflicting goals regarding reunification. Alternatively, the respondent seeks reversal of the judgments pursuant to the plain error doctrine. We conclude that we need not decide whether the respondent's children had a constitutional—as opposed to only a statutory—right to conflict free counsel because, even if they did, it is apparent that any violation of such a right was harmless error. We also decline the respondent's request to apply the plain error doctrine. Accordingly, we affirm the judgments of the trial court.

The following facts, which the trial court found by clear and convincing evidence or are otherwise undisputed, and procedural history are relevant to our resolution of this appeal. In March, 2015, the children's pediatrician contacted the Department of Children and Families (department) to voice concerns about domestic violence in the children's home. At the time, the children's father refused to allow investigators from the department to enter the family's home or to interview the children. He did allow an investigator to view the children, however, and, because she saw no visible marks or bruises on them, the department took no further action. In June, 2016, the respondent contacted the department to report intimate partner violence and to request assistance in obtaining secure housing for herself and the children. At that time, the respondent was referred to Community Health Resources for services and assistance. On May 9, 2018, the oldest child, Anaya, who was then ten years old, disclosed to a mandated reporter at her school that her father, while attempting to hit her twelve year old half brother,[5] had struck her in the jaw with a closed fist, causing her to fall from her bicycle. Anaya sustained minor injuries and a sore jaw as a result of the incident.

The department's investigation into this incident revealed that the father has a lengthy criminal history

in Connecticut, New Jersey, and Florida dating back to 2001, and that the police previously had been called to the children's school due to the father's erratic, paranoid, and threatening behavior. During the 2017–18 school year, Anaya and Amias, who was then seven years old, missed a combined forty-six days of school. When school officials attempted to discuss the matter with the father, he threatened to withdraw the children from school. He also refused to allow Anaya to receive special education services, even though she qualified for them, and refused to allow Amias to be tested for eligibility for those services, despite his apparent need for them. When meeting with school officials, the father would not allow the respondent to sit at the table or otherwise participate in the meetings. Instead, he would order her to sit in the back of the room, telling the officials present that the respondent has "no say" in matters affecting the children and that he is the respondent's "caretaker" and the sole decision maker in the family.

On May 9, 2018, an investigative social worker for the department went to the respondent's home to conduct a welfare check. Although the respondent refused to allow her into the residence, the social worker could see the youngest child, Adelyn, who was then four years old, through the door. Adelyn's hair appeared "messy and unkempt," and her neck and chin were "raw and red" from untreated eczema. A review of the children's medical records revealed that all of them had unmet dental and health care needs and that Anaya was in immediate need of a tooth extraction. The department also learned that the father would not allow Adelyn to receive medical treatment for her severe eczema.

On May 11, 2018, in response to the department's investigation, the father withdrew Anaya and Amias from school, instructing them that, if anyone asked, they were to say that they were being homeschooled, even though this was not true. On May 14, 2018, the father "left a twelve minute voice mail for the [investigative social worker], demanding that she cease and desist all contact with his family and [informing her] that, by law, he did not have to cooperate with the 'verbal kidnapping' of his children." In addition, he "threatened to place a 'commercial lien' on the [social worker's] property," asserting that "he was a 'secure party'" and that "the department [was] powerless to intervene with his family." He also "asserted [that he did not believe] in medications or medical intervention" and "warned the [social worker] not to return to his property."

On May 15, 2018, citing medical neglect, educational neglect, physical abuse, and domestic violence, the petitioner filed motions for orders of temporary custody of the children, which the court granted, as well as petitions of neglect on behalf of all three children. At that time, the court provided the respondent and the

father with specific steps[6] to facilitate reunification and to prevent termination of their parental rights. Among other things, both the respondent and the father were required to keep all appointments set by the department, accept in-home support services as determined by the department, to visit the children as often as the department permitted them to do so, to obtain adequate housing, to let the department know where they were at all times, to complete a domestic violence program, to attend parenting and individual counseling, to permit the department to monitor their progress toward established goals by signing releases that would allow the department to communicate with their service providers, not to get involved with the criminal justice system, and to attend to the children's physical, educational, medical, and emotional needs. Following their removal from the family home, the two older children were diagnosed with post-traumatic stress disorder in addition to other behavioral and emotional problems.

On May 17, 2018, at a meeting with the department, "the father presented as loud, stressed, paranoid, hostile, and unfocused. He claimed that the department took the children from him as governmental retaliation for his political views."[7] He also "threatened the [investigative social worker], telling her, 'I'm coming for you.' " On December 25, 2018, "the father posted a video on his Facebook page opining that suicide and violence [are] understandable when children are removed from a parent's home and that he would eventually take justice into his own hands. He [also] threatened to 'go after the property' of the department and a judge." On December 26, 2018, "[he] posted an article [on] Facebook [entitled] 'Is It Ethical for a Parent to Kill a [Child Protective Services] Worker.' [He also posted] a picture of a man aiming a handgun [with the caption] 'you will never see it coming.' " On December 27, 2018, the father was arrested and charged with inciting injury to persons or property and with three counts each of breach of peace and harassment. He was incarcerated for most of 2019 and almost all of 2020.[8]

On March 14, 2019, the court adjudicated the children neglected and committed them to the care and custody of the petitioner. On April 16, 2019, the court approved a permanency plan of termination of parental rights and adoption for the children with a concurrent goal of reunification. On August 14, 2019, the petitioner filed petitions to terminate the parental rights of the respondent and the father as to all three children pursuant to General Statutes § 17a-112 (j) (3) (B) (i), alleging a failure to rehabilitate.[9] A virtual trial on the petitions was held on two days in April, 2021, after which the court issued a memorandum of decision and granted the petitions. The court found by clear and convincing evidence that the department had made reasonable efforts to reunify the children with the respondent and the father but that neither parent had gained sufficient

insight into their circumstances or made sufficient progress toward the goals set for them by the department to encourage the belief that they could assume a responsible position in their children's lives at some future date. Specifically, the court stated that "[n]either parent successfully completed the court's specific steps in the approximately three years the children have been in foster care. Both refused or delayed access to needed histories and records. Both have been resistant to services and resources meant to benefit them and the children." The court also considered the seven statutory factors set forth in § 17a-112 (k)[10] and determined, by clear and convincing evidence, that termination of the respondent's and the father's parental rights was in the best interest of each child.

As to the respondent, the court specifically found that, although she and the children have a strong and loving bond, in the nearly three years that they were apart, the respondent failed to complete any of the specific steps set for her by the department. The court observed that, "[d]espite her initial resolve to do whatever was necessary to reunify with the children, her actions since then have proved her [being] either unwilling or incapable [of following through]." The record reflects that the respondent has a history of post-traumatic stress disorder and is currently diagnosed with a major depressive disorder and generalized anxiety. She also suffers from a serious medical condition that prevents her from working. Since losing custody of the children, she has resided primarily in homeless shelters or other temporary lodgings, and often has failed to keep the department apprised of her whereabouts. At the time of trial, the respondent was living in a one bedroom apartment that she readily acknowledged at trial was unsuitable for reunification with the children.

The court further found that, "[i]n December, 2019, [the respondent] began a relationship with a man. [Although] [t]he department initially viewed this separation from the father positively, [it] soon warned [the respondent] that the person with whom she had chosen to live had a history of family violence, protective orders, and past and current criminal involvement. He [also] presented with mental health issues during interactions with the department." There were indications that the respondent was still with this man at the time of trial, "despite the department's concerns about the risks [he] present[ed] to the children."

Of utmost concern to the court was the respondent's apparent inability to extricate herself from her abusive relationship with the children's father and to protect the children from him. The court observed that, "[s]ince the children's removal from their [parents' care] in 2018, the department [has] expressed concern that [the respondent] would not or could not protect the children from exposure to intimate partner violence in the house-

hold." The court further found that the respondent is "dominated and controlled" by the father, "voiced no opposition when he removed the children from school," and "echoes some of [the father's] ideology" eschewing medical intervention for the children. The court also noted that the respondent and the father have "separated at times during their relationship only to resume it later. Perhaps their latest separation is permanent, but given their lack of candor with anyone attempting to assess their circumstances, doubt remains. [The court-appointed psychologist] noted in his evaluation two years ago that [the respondent] would not likely keep the children safe from inappropriate contact with [the] father" and that "she is 'unlikely to be a reliable informant about [him].'" The court concluded that "[l]ittle has changed over the course of this lengthy case. [The respondent's] emotional stability, her judgment, and her ability to shield the children from inappropriate circumstances remain uncertain. And time continues to pass."

With respect to the children, the court found that Anaya "would prefer to be reunited with her parents—if they were together. If not, she has developed a strong relationship with her current foster mother. If her parents remain apart, [she] would like to stay in [her] foster mother's home and would consent to an adoption."[11] With respect to Amias, the court found that "[h]e has a positive, secure relationship with his foster family" and that, although "[h]e was once adamant about returning to his parents' household . . . lately, especially if the parents remain apart, he would choose to stay with his current foster parents." As for Adelyn, the court found that she "has definitely and definitively chosen her future. She is happy and secure in her current pre-adoptive foster home. She trusts this home and does not want to leave."[12]

In light of the foregoing, the court observed that "[t]he opportunity to rehabilitate is not limitless. Children cannot be left without permanency, stability, and a sense of belonging to a family forever." The court therefore concluded that, "[b]ased on each parent's inability to sufficiently recognize and remedy the issues that caused the children's removal, and their failure to substantially benefit from services and treatment, it is impossible to predict when in the future [the children] could be safely returned home. The evidence also established that [the children] are doing well in their present placement and that their caretakers have committed to adopting them. . . .

"The children can wait no longer for [the] parent[s] to recognize and remedy their issues. . . . The court finds by clear and convincing evidence . . . that it would be detrimental to the well-being of these children [to] delay permanency any longer in order to afford the [parents] additional time to pursue rehabilitative efforts

[that] have thus far proven unsuccessful. . . . Termination of parental rights is in the children's best interests." (Citations omitted; internal quotation marks omitted.)

On appeal, the respondent does not challenge any of the trial court's factual findings, including that (1) she failed to rehabilitate, (2) termination of her parental rights was in the best interest of each child, (3) Anaya preferred to return to her parents' care only if her parents were together, otherwise she preferred to stay with her foster family, and (4) although Amias initially wanted to return to his parents' care, at the time of trial, that was no longer the case, particularly if his parents were not together. The respondent's sole claim is that her children had a constitutional right to conflict free counsel and that the trial court violated that right by failing to inquire into whether their attorney had a conflict of interest predicated on the fact "that two of [the children] wanted the petition for termination to be denied while the third [child] wanted it granted."[13] The respondent contends that the trial court's error is not susceptible to harmless error analysis and, therefore, should be treated as a structural error subject to automatic reversal. She further contends that, even if the error is amenable to a harmlessness analysis, the record demonstrates that "having one attorney represent three children with differing goals" was harmful because it "made it impossible for the trial court to properly determine . . . in the first instance, whether the respondent was unable to achieve a degree of personal rehabilitation as to encourage the belief that she could assume a responsible position in her children's lives within a reasonable time. [It] also made it impossible for the trial court to properly determine whether it was in the best interests of the children to terminate the parental rights of the respondent." Because her claim is unpreserved, the respondent seeks review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015).[14] Alternatively, the respondent asks this court to reverse the judgments pursuant to the plain error doctrine.[15]

The petitioner responds that, even if the record were adequate for review, which she contends it is not, the respondent's constitutional claim fails under *Golding*'s remaining three prongs because children in a termination of parental rights proceeding do not have a constitutional right to counsel, only a statutory one. Even if the children had such a constitutional right, the petitioner argues, the children's divergent goals with respect to reunification did not create a conflict of interest for their attorney, who was perfectly capable of advocating effectively for each of their preferred outcomes. In this regard, the petitioner notes that courts routinely order different outcomes for siblings in termination of parental rights and other dependency proceedings. The peti-

tioner also contends that any error by the trial court in failing to inquire into Attorney Clark's alleged conflict of interest was harmless beyond a reasonable doubt because it is clear the result would have been the same even if the children had been represented by separate counsel. Finally, the petitioner contends that reversal under the plain error doctrine is unwarranted for a variety of reasons but principally because the respondent cannot demonstrate that a manifest injustice will occur if the judgments are not reversed. We agree with the petitioner's latter two contentions.[16]

Although we previously have held that parents in a termination of parental rights proceeding have standing to assert a claim that their children were denied their constitutional right to conflict free representation; see *In re Christina M.*, 280 Conn. 474, 486–87, 908 A.2d 1073 (2006) (concluding that parents have standing to raise claim because independent representation of child's interests affects parent's interest in parent-child relationship); we have yet to decide whether such a right exists.[17] For the reasons that follow, we conclude that the present case is not the appropriate vehicle to decide that question because, even if we assume that children in dependency proceedings have a constitutional right to conflict free counsel under the state and federal constitutions,[18] any violation of that right in the present case was harmless beyond a reasonable doubt. See, e.g., *State* v. *Golding*, supra, 213 Conn. 241–42 ("In many cases of an alleged constitutional violation . . . the state is able to demonstrate the harmlessness of such alleged violation beyond a reasonable doubt. . . . Under such circumstances, it would be a waste of judicial resources, and a pedantic exercise, to delve deeply into the constitutional merits of a claim that can appropriately be resolved in accordance with the relevant harmless error analysis." (Citations omitted.)); see also *State* v. *Dickson*, 322 Conn. 410, 497, 141 A.3d 810 (2016) (*Robinson*, *J.*, concurring) ("[t]his court often applies the doctrine of constitutional avoidance not to decide difficult questions of constitutional law when the state has established that any constitutional error will not affect the result of the appeal because it is harmless beyond a reasonable doubt"), cert. denied,     U.S.     , 137 S. Ct. 2263, 198 L. Ed. 2d 713 (2017).

This is not the first time we have been asked to decide whether children have a constitutional right to conflict free counsel in a child dependency proceeding. In *In re Christina M.*, the issue was squarely before us. We could not reach it, however, due to the inadequacy of the record. See *In re Christina M.*, supra, 280 Conn. 490. A brief review of that case is nevertheless helpful to an understanding of the issues presented in this appeal.

In *In re Christina M.*, the respondent parents claimed that the attorney appointed to represent their three children violated the children's constitutional right to

conflict free counsel by advocating, allegedly against the children's expressed wishes, that the parents' parental rights should be terminated. See id., 487–88. When that case was decided, attorneys appointed pursuant to § 46b-129a to represent children in dependency proceedings wore two hats—that of attorney, whose job it was to advocate for the legal interests of the child (i.e., the child's expressed wishes) and guardian ad litem, whose job it was to advocate for the child's best interest.[19] See General Statutes (Rev. to 2005) § 46b-129a ("a child shall be represented by counsel knowledgeable about representing such children who shall be appointed by the court to represent the child and to act as guardian ad litem for the child"). On appeal to this court, the parents argued that, "when a trial court has reason to believe that an attorney for a minor child is not advocating for that child's expressed wishes, the court has an independent obligation to intervene and conduct an inquiry to determine whether the attorney is representing the child in accordance with the Rules of Professional Conduct." *In re Christina M.*, supra, 280 Conn. 487.

In determining that the record was inadequate for review of this claim, this court explained that "should . . . a constitutional right exist in the termination of parental rights context, the requirements for establishing a violation would, at a minimum, be comparable to those applied to establish the violation in the criminal context." Id., 489. We further explained that, under the sixth amendment to the United States constitution, "[t]here are two circumstances under which a trial court has a duty to inquire with respect to a conflict of interest: (1) when there has been a timely conflict objection at trial . . . or (2) when the trial court knows or reasonably should know that a particular conflict exists . . . . A trial court's failure to inquire in such circumstances constitutes the basis for reversal of a defendant's conviction. . . . In the absence of an affirmative duty by the trial court to inquire, however, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his [or her] lawyer's performance in order to obtain reversal of his [or her] conviction. . . . Before the trial court is charged with a duty to inquire, the evidence of a specific conflict must be sufficient to alert a reasonable trial judge that the defendant's sixth amendment right to effective assistance of counsel is in jeopardy." (Internal quotation marks omitted.) Id.

Applying this standard in *In re Christina M.*, we determined that, "[e]ven [if we were] to assume that the children had a constitutional right, in addition to the statutory right under § 46b-129a, to conflict free representation, and that the trial court had the obligation to act, sua sponte, if the court knew or reasonably should have known that a particular conflict existed, the record . . . does not support the [parents'] claim

that the trial court knew or should have known that a conflict existed." Id., 493. Specifically, we noted that the record was silent as to the wishes of the two younger children and inconclusive as to the wishes of the oldest child, who, at the age of six, told the court-appointed psychologist that she wished to "go home with mommy and daddy . . . ." (Internal quotation marks omitted.) Id., 493–94. Approximately one year later, however, before the start of trial, she told her foster parents that she wished to remain with them "forever." Id., 494. In light of the conflicting nature of the evidence pertaining to the oldest child's wishes, we concluded that the record was insufficient to support a determination that the trial court knew or reasonably should have known that a conflict existed between what the child wanted at the time of trial and what her attorney had advocated. Id.

In the present case, the record is sufficient for us to determine that the trial court knew or should have known that a conflict existed between the goals of Amias and Adelyn, who wished to remain with their foster parents, and Anaya, who, if possible, wished to be reunited with her parents if they were together. It is apparent, however, that, even if we assume that the children's conflicting goals triggered the trial court's duty to inquire into their attorney's ability to advocate effectively on behalf of each child, the court's failure to undertake such an inquiry was harmless beyond a reasonable doubt. See, e.g., *State* v. *Ayala*, 324 Conn. 571, 599, 153 A.3d 588 (2017) ("when certain improprieties are of constitutional dimension, the burden falls on the state to establish that the impropriety was harmless beyond a reasonable doubt"). We reach this conclusion for the simple reason that Anaya's desire to return to her parents' care was contingent on her parents being together as a couple. If they were *not* together, the court found, she preferred to remain with her foster family.[20] It is clear from the record, however, that there is no possibility that the trial court would have allowed the children to return to the respondent's care in light of its findings concerning her failure to rehabilitate, much less so if the respondent was living with the children's father. Indeed, one of the factors that weighed heavily in the trial court's decision to terminate the respondent's parental rights was the respondent's lack of candor regarding her relationship with the father and the court's concern that she either could not or would not protect the children from him. It is equally apparent that the trial court would not have allowed the children to live with the father under any set of circumstances given his steadfast refusal, in the three years that he was apart from them, to address the myriad problems that precipitated the children's removal from the family home, including his refusal to seek "medication management" for unspecified mental health issues, which the trial court believed prevented him from "gaining a

focus on reality" and meeting the children's physical, emotional, and educational needs.[21]

The respondent's primary argument with respect to the issue of harm is that this court should treat the trial court's failure to inquire into counsel's alleged conflict of interest as per se reversible error, even if the effects of the error are quantifiable and even if this court can determine beyond a reasonable doubt that the error was harmless. This we will not do. Although this court has recognized that structural error can occur outside the criminal context; see, e.g., *Wiseman* v. *Armstrong*, 295 Conn. 94, 109–10, 989 A.2d 1027 (2010); to the best of our knowledge, we have never applied it in the child dependency context. On the two occasions that we were asked to do so, we either declined; see *In re Elvin G.*, 310 Conn. 485, 507 n.20, 78 A.3d 797 (2013) (disagreeing with dissenting justice's contention that structural error doctrine should apply to trial court's failure to provide statutorily mandated specific steps to parent in termination of parental rights proceeding when record indicated error was harmless beyond reasonable doubt); or the record was inadequate for our review. See *In re Christina M.*, supra, 280 Conn. 490. In every context in which we have applied the structural error doctrine, however, we have done so sparingly. See, e.g., *Banks* v. *Commissioner of Correction*, 339 Conn. 1, 29, 259 A.3d 1082 (2021) ("[o]nly a small share of constitutional errors are structural, that is, so presumptively harmful that they require automatic reversal"); *State* v. *Artis*, 314 Conn. 131, 153, 101 A.3d 915 (2014) ("most constitutional violations are subject to . . . harmless error review").

"Determining whether an error is structural requires a review of the nature of the right at issue and the effect of its denial on the proceeding. An error is generally structural when it affects the 'framework within which the trial proceeds'; *Arizona* v. *Fulminante*, [499 U.S. 279, 310, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991)]; such that 'the error always results in fundamental unfairness.' *Weaver* v. *Massachusetts*, U.S. , 137 S. Ct. 1899, 1908, 198 L. Ed. 2d 420 (2017)." *State* v. *Cushard*, 328 Conn. 558, 570, 181 A.3d 74 (2018). "In addition, an error may be deemed structural when 'the effects of the error are simply too hard to measure . . . .' *Weaver* v. *Massachusetts*, supra, [1908]." *State* v. *Cushard*, supra, 571. "Structural [error] cases defy analysis by harmless error standards because the entire conduct of the trial, from beginning to end, is obviously affected . . . ." (Internal quotation marks omitted.) *State* v. *Latour*, 276 Conn. 399, 410, 886 A.2d 404 (2005). "This court has found error to be structural only when the error renders a trial fundamentally unfair and is not susceptible to a harmless error analysis . . . ." (Internal quotation marks omitted.) *State* v. *Brown*, 279 Conn. 493, 505, 903 A.2d 169 (2006).

We agree fully with the California Supreme Court's reasoning in *In re James F.*, 42 Cal. 4th 901, 915–16, 174 P.3d 180, 70 Cal. Rptr. 3d 358 (2008), in which that court concluded that the significant differences between child dependency proceedings and other judicial proceedings militate decisively against applying a per se reversible error rule in dependency cases. See id., 917 ("[w]e cannot agree . . . that prejudice is irrelevant in a dependency proceeding when the welfare of the child is at issue and delay in resolution of the proceeding is inherently prejudicial to the child"). "[T]he price that would be paid for [applying such a rule], in the form of needless reversals of dependency judgments, is unacceptably high in light of the strong public interest in prompt resolution of these cases so that the children may receive loving and secure home environments as soon as reasonably possible." Id., 918.

Recently, the California Supreme Court reaffirmed this view in *In re Christopher L.*, 12 Cal. 5th 1063, 508 P.3d 776, 292 Cal. Rptr. 3d 815 (2022), noting that, although the United States Supreme Court has cautioned that "[a]n error can count as structural even if the error does not lead to fundamental unfairness in every case . . . in the dependency context, automatic reversal for errors that do not invariably lead to fundamental unfairness would exact a particularly steep cost. There is little that can be as detrimental to a child's sound development as uncertainty over whether he is to remain in his current home, under the care of his parents or foster parents, especially when such uncertainty is prolonged. [*Lehman* v. *Lycoming County Children's Services Agency*, 458 U.S. 502, 513–514, 102 S. Ct. 3231, 73 L. Ed. 2d 928 (1982)]. We emphatically agree that dependent children have a critical interest in avoiding unnecessary delays to their long-term placement." (Citation omitted; internal quotation marks omitted.) *In re Christopher L.*, supra, 1081; see also *Sarah A.* v. *State*, 427 P.3d 771, 779–80, 784 (Alaska 2018) (declining to apply structural error doctrine in termination of parental rights proceeding and instead considering whether alleged constitutional error deprived parent of "sufficient opportunity to present case" (internal quotation marks omitted)); *In re Carrington H.*, 483 S.W.3d 507, 533 (Tenn.) ("[Although] the burdens resulting from extended, collateral attacks on convictions [may be] justified [in the criminal context due to] the complete deprivation of personal liberty [that often follows a conviction] . . . [i]n parental termination proceedings, the burdens of extended litigation fall most heavily [on] children—those most vulnerable and most in need of protection, stability, and expeditious finality. . . . Due to the immeasurable damage a child may suffer amidst the uncertainty that comes with such collateral attacks, it is in the child's best interest and overall [well-being] to limit the potential for years of litigation and instability." (Citations omitted; internal quotation

marks omitted.)), cert. denied sub nom. *Vanessa G.* v. *Tennessee Dept. of Children's Services*,        U.S.        , 137 S. Ct. 44, 196 L. Ed. 2d 28 (2016).

The concerns expressed in these cases accord with the long-standing policy of this state, as explained in *In re Juvenile Appeal (Docket No. 10155)*, 187 Conn. 431, 446 A.2d 808 (1982), that "the ultimate standard underlying the whole statutory scheme regulating child welfare is the best interest of the child. The public policy of this state . . . is [t]o protect children whose health and welfare may be adversely affected through injury and neglect . . . to provide a temporary or permanent nurturing and safe environment for children when necessary . . . . Time is of the essence in child custody cases. See *In re Juvenile Appeal (Anonymous)* v. *Commissioner of Children & Youth Services*, 177 Conn. 648, 420 A.2d 875 (1979). . . . [Avoiding undue delays] furthers the express public policy of this state to provide all of its children a safe, stable nurturing environment. *State* v. *Anonymous*, 179 Conn. 155, 170–71, 425 A.2d 939 (1979)." (Internal quotation marks omitted.) *In re Juvenile Appeal (Docket No. 10155)*, supra, 439–40.

In light of the foregoing, we conclude that a per se rule of automatic reversal for errors in cases such as the present one is unwarranted. When, as in the present case, the reviewing court can and does determine that an error was harmless beyond a reasonable doubt, the judgment must stand. In such cases, reversal under the plain error doctrine would be equally unwarranted given that a party can prevail under that doctrine only by demonstrating that the failure to grant relief will result in manifest injustice.[22]

The judgments are affirmed.

In this opinion the other justices concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** June 29, 2022, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The respondent mother appealed from the trial court's judgments to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] The trial court also rendered judgments terminating the parental rights of the respondent father, Fernando I. Because he did not appeal from those judgments, we hereinafter refer to the respondent mother as the respondent and Fernando I. as the father.

[3] General Statutes § 46b-129a provides in relevant part: "In proceedings in the Superior Court under section 46b-129 . . . (2) (A) A child shall be represented by counsel knowledgeable about representing such children who shall be assigned to represent the child by the office of Chief Public Defender, or appointed by the court if there is an immediate need for the appointment of counsel during a court proceeding. . . . Counsel for the child shall act solely as attorney for the child. . . .

"(C) The primary role of any counsel for the child shall be to advocate for the child in accordance with the Rules of Professional Conduct, except that if the child is incapable of expressing the child's wishes to the child's counsel because of age or other incapacity, the counsel for the child shall

advocate for the best interests of the child. . . ."

[4] "Procedural due process imposes constraints on governmental decisions [that] deprive individuals of 'liberty' or 'property' interests within the meaning of the [d]ue [p]rocess [c]lause of the . . . [f]ourteenth [a]mendment." *Mathews* v. *Eldridge*, 424 U.S. 319, 332, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). Under *Mathews*, in determining whether a procedural due process right exists, the United States Supreme Court applies a three part test that "requires a consideration of the private interest that will be affected by the official action, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards . . . and . . . the [g]overnment's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." (Internal quotation marks omitted.) *Sassone* v. *Lepore*, 226 Conn. 773, 781, 629 A.2d 357 (1993).

[5] Anaya's older half brother lives with his biological mother and is not a party to these proceedings.

[6] "Specific steps provide notice and guidance to a parent as to what should be done to facilitate reunification and prevent termination of rights. Their completion or noncompletion, however, does not guarantee any outcome. A parent may complete all of the specific steps and still be found to have failed to rehabilitate. . . . Conversely, a parent could fall somewhat short in completing the ordered steps, but still be found to have achieved sufficient progress so as to preclude a termination of his or her rights based on a failure to rehabilitate." (Citation omitted.) *In re Elvin G.*, 310 Conn. 485, 507–508, 78 A.3d 797 (2013).

[7] In its memorandum of decision, the trial court observed that "[a]ny discussion of the father must begin with his political beliefs. He asserts that he is 'a naturalized citizen of the United States under the diversity clause of the constitution,' thereby rejecting and renouncing 'all citizenship or other assumed political status' of the United States. . . . Simply put, among his many assertions about the government, [he] does not accept that courts and judges have any legal authority over him. [His] filings and some of his claims before [the court] clearly demonstrate this notion." (Citation omitted.) The court agreed with a prior judge's assessment during the neglect proceeding that "the father's filings and writings are largely incomprehensible . . . ." The court further noted, however, that, "despite his beliefs—with some minor exceptions—the father treated [the] court with dignity and made his claims respectfully."

[8] The father was released from incarceration with conditions on May 7, 2019. After missing a mandatory court appearance on July 23, 2019, "he removed a [global positioning system] monitor and fled to New York. His whereabouts were unknown to the department until he was again [incarcerated] in September, 2019. [He] remained incarcerated until December 16, 2020."

[9] "In order to terminate a parent's parental rights under [General Statutes] § 17a-112, the petitioner is required to prove, by clear and convincing evidence, that: (1) the department has made reasonable efforts to reunify the family; General Statutes § 17a-112 (j) (1); (2) termination is in the best interest of the child; General Statutes § 17a-112 (j) (2); and (3) there exists any one of the seven grounds for termination delineated in § 17a-112 (j) (3)." (Footnote omitted.) *In re Samantha C.*, 268 Conn. 614, 628, 847 A.2d 883 (2004). Section 17a-112 (j) (3) (B) (i) allows for termination if a child has been found by the Superior Court to have been neglected and the parent has "failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ."

"Personal rehabilitation . . . refers to the restoration of a parent to . . . her former constructive and useful role as a parent . . . [and] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . The statute does not require [a parent] to prove precisely when she will be able to assume a responsible position in her child's life. Nor does it require her to prove that she will be able to assume full responsibility for her child, unaided by available support systems. It requires the court to find, by clear and convincing evidence, that the level of rehabilitation she has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date she can assume a responsible position in her child's life." (Internal quotation marks omitted.)

*In re Samantha C.*, supra, 628–29.

[10] General Statutes § 17a-112 (k) provides: "Except in the case where termination of parental rights is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2) whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption and Safe Families Act of 1997, as amended from time to time; (3) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect to the child's parents, any guardian of such child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."

[11] During closing argument before the court, the children's attorney stated that Anaya "does vocalize that she would like to return to her parents' care. . . . I think she . . . wish[es] that [her] parents could be together. But knowing that that's not happening right now, she finally has some degree of stability despite the fact that [she's] been three years in foster care. She's been at the current home for long enough where I think she does feel secure or as secure as she can. But she is going to, I think, hold on to that want to return to her parents' care . . . ."

[12] During closing argument brfore the court, the children's attorney stated that Adelyn "vehemently and very clearly has stated that she does not want to return to the care of either parent, together or separate. She is very happy where she is. . . . [She] has a sense of security that she's never had before and is able to articulate and say what she wants . . . . And . . . she would argue it is [100] percent in her best interest to remain where she is . . . ."

[13] We note that the record does not reflect that Amias wanted the termination petition to be denied at the time of trial, as the respondent asserts. As previously indicated, the trial court found that, although Amias initially expressed a strong desire to return to his parents' care, at trial, that was no longer his position. The closing argument of the children's attorney is consistent with this finding. She stated that, although Amias originally had expressed a desire to return home, when she met with him last, he "didn't really want to tell me one way or the other . . . ." Her impression was that he was "content in his [foster home]" and "feels a sense of security there . . . ." She offered, however, that, if "pressed" to say one way or the other, "a child . . . is gonna say they wanna return home to what their biological parents can offer them. So he, as I said, he didn't really want to say the last time I . . . met with him in March, but I think . . . if pressed, he would still say that he would like to return to the care of his parents."

[14] Pursuant to *Golding*, "a defendant can prevail on a claim of a constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original; footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40; see *In re Yasiel R.*, supra, 317 Conn. 781 (modifying third prong of *Golding*).

[15] "[T]he plain error doctrine, codified at Practice Book § 60-5, is an extraordinary remedy used by appellate courts to rectify errors committed at trial that, although unpreserved [and nonconstitutional in nature], are of

such monumental proportion that they threaten to erode our system of justice and work a serious and manifest injustice on the aggrieved party. [T]he plain error doctrine . . . is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment . . . for reasons of policy. . . .

"Although a complete record and an obvious error are prerequisites for plain error review, they are not, of themselves, sufficient for its application. . . . [I]n addition to examining the patent nature of the error, the reviewing court must examine that error for the grievousness of its consequences in order to determine whether reversal under the plain error doctrine is appropriate. A party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice. . . . [This court previously has] described the two-pronged nature of the plain error doctrine: [An appellant] cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is *both* so clear *and* so harmful that a failure to reverse the judgment would result in manifest injustice. . . . [O]ur review . . . with respect to plain error is plenary." (Citations omitted; emphasis in original; footnote omitted; internal quotation marks omitted.) *State* v. *Jamison*, 320 Conn. 589, 595–97, 134 A.3d 560 (2016).

[16] After the respondent filed her appeal, we granted the requests of the Office of the Chief Public Defender and the Center for Children's Advocacy, Inc., to file amicus curiae briefs addressing the issue of whether children in a termination of parental rights proceeding have a constitutional right to counsel.

[17] This court previously has held that, in termination of parental rights proceedings, parents have no right to counsel under the sixth amendment to the United States constitution or article first, § 8, of the Connecticut constitution, which apply only to criminal defendants. See *State* v. *Anonymous*, 179 Conn. 155, 159–60, 425 A.2d 939 (1979). We have also held, however, that "[when] . . . a statute . . . or [rule of practice] . . . mandates the assistance of counsel, it is implicit that this means competent counsel. Because of the substantial interests involved, a parent in a termination of parental rights hearing has the right not only to counsel but to the effective assistance of counsel." (Citations omitted.) Id., 160. It is axiomatic that the right to effective assistance of counsel means the right to the assistance of counsel free of conflicts of interest. See, e.g., *State* v. *Davis*, 338 Conn. 458, 469, 258 A.3d 633 (2021). This right and its implementation under § 46b-129a are discussed in the amicus curiae brief of the Office of the Chief Public Defender (OCPD). In its brief, the OCPD "elucidate[s] for the court the procedures in place for the appointment and training of the attorneys [selected by its office to] represent children in [dependency proceedings] . . . and the procedures available to ensure that children in fact receive competent, zealous, conflict free representation in [those] proceedings . . . ." The OCPD explains that, although some dependency cases are handled internally, the majority of them are assigned to contracted private attorneys selected and trained by the OCPD. "The training includes units on case law, trial advocacy, client counseling, and professional responsibility. The OCPD requires attorneys representing children to visit their clients at least once every six weeks for children who are nonverbal . . . every three months for all [other] children, whenever a child's placement changes, and shortly prior to each court hearing." If a conflict of interest arises in the course of an attorney's concurrent representation of a sibling group, the OCPD appoints additional counsel for the children to eliminate any such conflict. In its brief, the OCPD opposes the rule proposed by the Center for Children's Advocacy in its amicus curiae brief "that, whenever multiple children have different positions as to the outcome of a termination of parental rights petition, counsel should be deemed conflicted, per se." The OCPD argues that such a per se rule is unwarranted because "[f]actual circumstances may arise where, owing to differences in age, needs, and circumstances between children, counsel can advocate for termination as to one child but not another without contradiction."

[18] We note that, in *Lassiter* v. *Dept. of Social Services*, 452 U.S. 18, 101 S. Ct. 2153, 68 L. Ed. 2d 640 (1981), the United States Supreme Court considered and rejected a claim that "the due process clause of the fourteenth amendment requires the appointment of counsel for indigent parents in every parental status termination proceeding. See id., 24. The court read its prior cases as establishing a presumption that an indigent litigant has a right to appointed counsel only when his or her physical liberty is at stake.

Id., 25–27. The court then applied the due process balancing test set forth in *Mathews* v. *Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976)—weighing the competing private and governmental interests at stake and the risk of an erroneous decision in the absence of appointed counsel—to determine whether an indigent parent's interest in obtaining the assistance of counsel is sufficiently compelling to overcome that presumption. *Lassiter* v. *Dept. of Social Services*, supra, 27–32.

"Despite [marshaling] a number of potentially convincing arguments in favor of recognizing a right to counsel; see id.; the court ultimately declined to hold that due process requires the appointment of counsel whenever a state seeks to terminate the parental rights of an indigent parent. Id., 31. Instead, the court held that whether the federal constitution requires the appointment of counsel is a fact specific determination that must be made by balancing the *Mathews* factors on a case-by-case basis. See id., 31–32. The court further cautioned that, in light of the presumption against the right to appointed counsel in the absence of a potential deprivation of physical liberty, such a right would exist only '[i]f, in a given case, the parent's interests [are] at their strongest, the [s]tate's interests [are] at their weakest, and the risks of error [are] at their peak . . . .' Id., 31." (Footnote omitted.) *In re Taijha H.-B.*, 333 Conn. 297, 319–20, 216 A.3d 601 (2019). In their briefs to this court, the parties agree that any determination as to whether children in a dependency proceeding have a procedural due process right to counsel would be subject to the same balancing test utilized in *Lassiter* for determining a parent's right to counsel.

[19] In *In re Christina M.*, this court noted that, "[w]hile the best interest of a child encompasses a catholic concern with the child's human needs regarding his or her psychological, emotional, and physical well-being, the representation of a child's legal interests requires vigilance over the child's legal rights. Those legal rights have been enumerated as the right to be a party to a legal proceeding, the right to be heard at that hearing and the right to be represented by a lawyer. When both a guardian ad litem and an attorney have been appointed for a child, their respective roles and the duties attendant to those roles should adhere to that basic distinction." (Internal quotation marks omitted.) *In re Christina M.*, supra, 280 Conn. 492. Following our decision in that case, the legislature amended § 46b-129a to ensure that attorneys assigned to represent children in dependency proceedings perform only one role—that of the child's legal representative advocating for the child's expressed wishes. Toward this end, subdivision (2) (A) of the statute now provides that attorneys assigned to represent children in such proceedings "shall act solely as attorney for the child." General Statutes § 46b-129a (2) (A). Subdivision (2) (C) further provides that "[t]he primary role of any counsel for the child shall be to advocate for the child in accordance with the Rules of Professional Conduct, except that if the child is incapable of expressing the child's wishes to the child's counsel because of age or other incapacity, the counsel for the child shall advocate for the best interests of the child." General Statutes § 46b-129a (2) (C). With respect to the assignment of guardian ad litems, subdivision (2) (D) provides that, "[i]f the court, based on evidence before it, or counsel for the child, determines that the child cannot adequately act in his or her own best interests and the child's wishes, as determined by counsel, if followed, could lead to substantial physical, financial or other harm to the child unless protective action is taken, counsel may request and the court may order that a separate guardian ad litem be assigned for the child, in which case the court shall either appoint a guardian ad litem to serve on a voluntary basis or notify the office of Chief Public Defender who shall assign a separate guardian ad litem for the child." General Statutes § 46b-129a (2) (D).

[20] The respondent does not challenge in this court the trial court's finding that Anaya's wish to return to her parents' care was contingent on her parents being together. See *In re Jacob W.*, 330 Conn. 744, 770, 200 A.3d 1091 (2019) ("Appellate review of a trial court's findings of fact is governed by the clearly erroneous standard of review. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.)). Thus, we have no cause to review the trial court's findings pertaining to the children's individual wishes with respect to reunification, and the circumstances, if any, under which they would wish to return to their parents' care.

[21] With respect to the father's "mental status" and "focus on reality," the

court-appointed psychologist, whose opinion the trial court credited, stated in his report, among other things: "The father presented a variety of unusual beliefs. Most of these are evident in postings on the [I]nternet, and it appears that this is where he learned of them. Many reflect views of the so-called 'Sovereign [Citizen]' movement, and some libertarian websites (wherein, for example, the article on killing [child protective service] workers is listed—including the photo[graph] of an individual aiming a gun). He maintained, '[a] trust exists, but most people don't claim their name at the age of majority. It's all based on the trust and [the department] has breached that trust.' Elsewhere, he defined the trust as '[a] given name my mother gave me, that it's all capital, but they didn't tell my mom. I was given to the state.' He volunteered that he felt that Hurricane Maria was [the] product of two ships in the Caribbean blowing smoke into the environment, with the intent of directing a severe hurricane at the island."

[22] We emphasize once again that when, as in the present case, a statute mandates the assistance of counsel, this means the effective assistance of counsel, unencumbered by conflicts of interest. See footnote 17 of this opinion. Under rule 1.7 of the Rules of Professional Conduct, attorneys representing multiple clients must disqualify themselves or withdraw from representing one or more of the clients whenever they perceive that continued joint representation will be directly adverse to one or more of the clients. We urge our trial courts, whenever they have reason to believe that a conflict of interest has arisen in a dependency proceeding, whether as a result of an attorney's joint representation of multiple children with divergent goals or for any other reason, to inquire into the existence of any such conflict and to take appropriate action if the court determines that a conflict in fact exists. See, e.g., *Bergeron* v. *Mackler*, 225 Conn. 391, 397, 623 A.2d 489 (1993) ("[t]he trial court has broad discretion to determine whether there exists a conflict of interest that would warrant disqualification of an attorney"); see also *Daniels* v. *Alander*, 268 Conn. 320, 329, 844 A.2d 182 (2004) ("[t]he trial court has the authority to regulate the conduct of attorneys and has a duty to enforce the standards of conduct regarding attorneys" (internal quotation marks omitted)). We further emphasize, however, consistent with the views expressed by the Office of the Chief Public Defender (OCPD) in its amicus curiae brief, that merely because multiple children in a family have different goals with respect to the outcome of a termination of parental rights proceeding does not necessarily mean that the attorney representing them has a conflict of interest. As the OCPD so aptly states in its amicus brief, "[f]actual circumstances may arise where, owing to differences in age, needs, and circumstances between children, counsel can advocate for termination as to one child but not another without contradiction." Whether circumstances are such that an attorney can advocate effectively on behalf of each child despite the children's divergent goals should be made, in the first instance, by the attorney representing them in consultation with the OCPD, which is tasked with assigning and training the attorney pursuant to § 46b-129a (2) (A). See, e.g., *In re Christina M.*, supra, 280 Conn. 490 ("[C]ounsel have an ethical obligation to avoid conflicting representations and to advise the court promptly when a conflict of interest arises during the course of trial. . . . [T]rial courts necessarily rely in large measure [on] the good faith and good judgment of . . . counsel." (Internal quotation marks omitted.)).